2021 IL App (4th) 200360

NO. 4-20-0360

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 28, 2021
Carla Bender
4th District Appellate
Court, IL

| | |
|---|---|
| MARK ALLEN, | ) Appeal from the |
|     Plaintiff-Appellee, | ) Circuit Court of |
|     v. | ) Coles County |
| SARAH BUSH LINCOLN HEALTH CENTER, | ) No. 13L45 |
|     Defendant-Appellant. | ) |
| | ) Honorable |
| | ) Mark E. Bovard, |
| | ) Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices DeArmond and Holder White concurred in the judgment and opinion.

**OPINION**

¶ 1        On September 21, 2012, plaintiff, Mark Allen, felt a "pop" in his neck and began to experience neck pain. That same day, Allen sought medical care from defendant, Sarah Bush Lincoln Health Center, at defendant's emergency department. Allen was given painkillers and discharged. The following day, September 22, 2012, Allen again went to defendant's emergency room and, again, was given painkillers and discharged.

¶ 2        On September 26, 2012, Allen's condition worsened. He went to defendant's emergency room where he was seen by Dr. Derek Stout, who ordered a computerized tomography (CT) scan for Allen. That scan was read by Dr. Lynn Dale, a radiologist. Stout believed the problem to be a viral infection and discharged defendant. On September 27, Allen collapsed and was taken to defendant's emergency room via ambulance before being transferred to Carle Hospital (Carle) early the following morning. At Carle, a neurologist examined Allen and ordered

a magnetic resonance imaging (MRI) scan, which revealed that Allen had a spinal epidural abscess. Allen had spinal surgery to drain the abscess but still suffered a spinal cord injury as a result of the abscess.

¶ 3     In September 2013, Allen sued defendant for negligence, alleging that defendant and defendant's agents had a duty to "possess and apply the knowledge, and use the skill and care ordinarily used by reasonably careful professionals in their respective fields," a claim commonly referred to as medical malpractice. In December 2019, the trial court conducted a jury trial on Allen's claim. The jury returned a $14 million verdict in favor of Allen.

¶ 4     Defendant appeals, arguing that (1) the trial court erred by instructing the jury that defendant's sole proximate cause defense could not be based on the act of a nonparty apparent agent, (2) the trial court erred by allowing an internist and an orthopedic surgeon to testify regarding the standard of care for an emergency room physician, and (3) defendant was deprived of a fair trial because of Allen's counsel's pervasive misconduct.

¶ 5     We disagree and affirm.

¶ 6                              I. BACKGROUND

¶ 7                          A. Pretrial Proceedings

¶ 8     In September 2013, Allen filed a complaint against defendant, alleging medical malpractice. The complaint alleged, in part, the following: (1) on September 21 and 22, 2012, Allen presented to defendant's emergency department complaining of pain in his shoulder and neck but was discharged on both days; (2) on September 26, 2012, at around 10:25 a.m., Allen presented again to defendant's emergency department where he was seen by Stout; (3) Stout was defendant's agent; (4) Allen's blood was tested at around 12:35 p.m. and showed he had an abnormally high white blood cell count; (5) during the September 26 visit, Allen complained of

pain and weakness throughout his body, including from his neck down to his waist, as well as an intermittent fever; (6) around 2:36 p.m., defendant discharged Allen from the hospital; (7) Allen continued to deteriorate after leaving the hospital; and (8) defendant and its agents acted negligently in several ways that resulted in defendant's failing to diagnose and treat Allen's spinal epidural abscess.

¶ 9        Extensive pretrial proceedings occurred, and then, in December 2019, the trial court conducted a final pretrial hearing at which the court stated, "The plaintiff is granted until the beginning of tomorrow to file an amended complaint, wherein Sarah Bush Lincoln Health Center would be the sole named defendant, along with its agents, apparent agents and employees." A few days later, Allen filed that complaint, alleging defendant was responsible for the negligence of its actual and apparent agents for failing to diagnose Allen's spinal epidural abscess. This complaint did not identify any particular physician.

¶ 10        We note that at trial, Dr. Ali Raja, one of Allen's expert witnesses, provided a detailed description of a spinal epidural abscess, explaining as follows:

>        "[T]here's a few key parts of this spine. The first is the spinal cord ***. What you can't see as clearly is that the spinal cord is actually covered by three different layers. Now the outside layer is called the dura. So when we talk about an epidural abscess, in Latin, 'epi' means outside. And epidural is an abscess or pocket of pus outside of the spine but inside of the [spinal column]. Now, because of the fact the bone isn't going anywhere—it's really hard—when that epidural abscess starts growing, it can't move the bone. So what it does is, it actually starts moving and compressing the spine ***."

¶ 11        B. Defendant's Motion for Partial Summary Judgment

¶ 12      In March 2017, defendant filed a motion for partial summary judgment in which defendant asked the trial court to find that Dale was neither the actual nor apparent agent of defendant. In the motion, defendant noted, "Plaintiff's counsel has expressed concern that Defendants will 'point blame . . . at the radiologist (Dr. Dale) at Sarah Bush Lincoln who read the CT . . . .' " (We note the Mayo Clinic describes a CT scan as follows: "A computerized tomography (CT) scan combines a series of X-ray images taken from different angles around your body and uses computer processing to create cross-sectional images (slices) of the bones, blood vessels and soft tissues inside your body. CT scan images provide more-detailed information than plain X-rays do." *CT Scan*, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/ct-scan/about/pac-20393675 (last visited May 25, 2021) [https://perma.cc/8LZW-UH2U].)

¶ 13      In November 2017, the trial court granted in part defendant's motion for partial summary judgment, stating that it found no genuine issue of material fact regarding actual agency because Dale was not an actual agent of the hospital. However, the court added that it found "there exists genuine issues of material fact as to the apparent agency between Dr. Dale and [defendant]."

¶ 14                                    C. The Trial

¶ 15      In November 2019, both parties filed motions *in limine*, including defendant's motion *in limine* to bar the standard of care opinions of Dr. Avi Bernstein and Dr. Jeff Kopin, whom defendant expected Allen to call as witnesses. Defendant argued that neither doctor met the foundational requirements for a standard of care opinion for emergency medicine. At a December 2019 hearing on those motions, the trial court noted that it had read Kopin's deposition, was "satisfied as to his ability," and denied defendant's motion as to Kopin. However, the court said, "I'm going to reserve as to Bernstein."

¶ 16      Later in December 2019, the trial court conducted the jury trial.

¶ 17          1. *Allen's Motion for Leave To File a Second Amended Complaint*

¶ 18          On the third day of trial, Allen moved for leave to file a second amended complaint that contained two counts. Count I, similar to the amended complaint, alleged that defendant's agents failed to timely diagnose Allen's abscess on September 26, 2012, but added the allegation that defendant's agents "failed to properly read and interpret the CT scan." Count II was a cause of action against defendant through Dale, the radiologist who interpreted the CT scan, based upon Dale's status as an apparent agent of defendant.

¶ 19          The trial court denied Allen's motion for leave to file the second amended complaint because, in part, (1) Allen's original complaint was based solely on Stout's negligence and never alleged Dale made a mistake and (2) Allen made no attempt to amend his complaint two years earlier when Allen would have first known that defendant was likely to contend Dale's error was the sole proximate cause of Allen's injuries.

¶ 20                    2. *Allen's Evidence*

¶ 21                        a. Melissa Taylor

¶ 22          Melissa Taylor testified that she was Allen's ex-wife and the mother of his children. She met Allen in 2004, and they had two children, born in 2008 and 2010. She testified about her relationship with Allen and his relationship with their children. She described him as a very involved father. Allen used to be a professional drummer who toured worldwide with well-known bands, but during their marriage, he began to work as a landscaper.

¶ 23          Taylor testified that Allen began feeling severe pain on September 20, 2012. He was moving furniture when he felt a "pop" in his neck. The pain persisted and woke him up around midnight, which caused them to go to defendant's emergency room at around 2 or 3 in the morning on September 21. At that visit, doctors gave Allen pain medication and sent him home.

¶ 24    On the next day, September 22, Allen still had severe neck pain even after taking the medication, and he had a fever. Taylor took Allen's temperature, and it read either 102 or 103 degrees, so they went back to defendant's emergency room. Defendant's doctors did some tests before giving Allen more pain medication and again sending him home. A doctor told Taylor that Allen had a pulled muscle, and the emergency room doctor thought the fever was from a viral infection.

¶ 25    On September 25, Allen began to notice a tingling pain from the middle of his neck down his spine and into his waist.

¶ 26    On September 26, 2012, Allen's condition had continued to deteriorate. He had severe neck pain, and the pain medication was not providing any relief. Taylor and Allen had difficulty controlling Allen's fever, and Allen began to experience tingling in his hands. Allen's shoulders felt like they were burning and were sensitive to the touch. Taylor said that Allen noticed a "weird tingling, burning sensation in both shoulders that he noticed when he was changing clothes." Taylor explained that the new symptoms were what prompted them to go back to defendant's emergency room where they spoke with Stout.

¶ 27    Taylor testified that Stout appeared rushed. She recalled that Allen told Stout,

"he had been there twice before for neck pain. He said that his neck was still hurting severely. He said that his fingers were tingling, and he said that he was frightened by this sharp, tingling pain going from the middle of his neck down to his waist. That it felt like he was being shocked, and that was really scaring him, and that's why he was back."

¶ 28    Taylor testified that Allen told the nurses the same information he provided to Stout. Allen's counsel asked if Taylor or Allen told Stout and the nurses that Allen had intermittent

- 6 -

fevers between September 21 and 26, and Taylor responded, "Yes."

¶ 29      Taylor testified that Stout ordered lab tests and a CT scan. When Stout spoke with Taylor and Allen again following the tests, he told them that Allen's white blood cell count was elevated, which meant he had an infection. Stout said the CT scan was normal and the infection was likely viral. Stout suggested the possibility of doing a lumbar puncture but explained that it would be severely painful and would not change his treatment plan. Thus, Allen and Taylor declined to do the puncture. Stout prescribed Allen stronger pain medication, Percocet, and told Allen and Taylor the viral infection would have to run its course.

¶ 30      In total, Allen and Taylor were at the emergency department for "a couple of hours" on September 26. For the remainder of the day, Allen was mostly either in bed or on the couch.

¶ 31      The following day, September 27, Allen's condition deteriorated further. Taylor testified that after dinner, Allen "was sitting on the couch in the living room, and he was starting to have trouble pulling himself to a standing position after he was sitting. He said he felt like he just didn't have enough energy, enough strength, to get himself up." Allen could not urinate. Taylor asked Allen if they should go back to the hospital, but "[h]e said, you know, he'd been there three times. They told him to wait it out. He was just trying to wait it out."

¶ 32      Taylor testified that later that evening, on the fifth or sixth time Allen was trying to go to the bathroom, "he collapsed on the bathroom floor; and he couldn't get up. And so I called 911." An ambulance took Allen to defendant's emergency room, and Taylor followed.

¶ 33      Upon arrival, a catheter was placed in Allen, and he continued to have difficulty moving his legs. Medical personnel did a lumbar puncture and then sent Taylor and Allen via ambulance to Carle Hospital in Urbana. During the ambulance ride, Allen began having trouble breathing. By the time they arrived at Carle, Allen was incoherent when he spoke to Taylor. When

it came time for Allen to have surgery, Taylor had to sign for him because he could not hold a pen.

¶ 34        Taylor explained that she and Allen had since divorced. Allen could no longer do many of the things he used to do, such as riding a bike, swimming, and other activities with his children.

¶ 35                                b. Mark Allen

¶ 36        Allen testified about his background as a professional drummer and his relationship with his children. He said that he toured as a drummer after high school and then worked various jobs before becoming a landscaper.

¶ 37        Allen testified that on September 21, 2012, he was moving boxes at his mother's house when he felt pain and numbness in his neck. He explained that he went to defendant's emergency room because he had been there before when he was younger and "[t]hey advertise all over the community in mailers, radio ads, TV." He was relying on defendant to take care of him and provide complete care. Allen did not know that defendant had agreements with doctors in which they were not actual employees. When asked what his memory of defendant's advertisements was, Allen said, "That their doctors and staff are the best around or that they're competent, I guess."

¶ 38        On cross-examination, defendant asked Allen if he signed consent forms that said some of defendant's doctors were independent contractors. Allen said he signed the forms but never read them.

¶ 39                                c. The Expert Witnesses

¶ 40        Allen called three medical doctors to testify as experts: Raja, Kopin, and Bernstein. Allen asked each doctor their opinion regarding (1) the standard of care in an emergency room and (2) whether Stout violated that standard of care.

¶ 41　　　　　Defendant does not dispute that Raja, an emergency medicine physician, had the qualifications to render an opinion regarding the emergency medicine standard of care. Raja testified that Allen presented to Stout with the classic triad of symptoms for a spinal epidural abscess: (1) fever, (2) pain radiating down the back, and (3) neurological changes such as tingling and hypersensitive skin on the shoulders. Because a spinal epidural abscess is a life-threatening illness, Raja opined that Stout should have put it at the top of his differential diagnosis, not the bottom; further, Stout should have immediately ordered an MRI. (We note the Mayo Clinic describes an MRI as follows: "Magnetic resonance imaging (MRI) is a medical imaging technique that uses a magnetic field and computer-generated radio waves to create detailed images of the organs and tissues in your body." Mayo Clinic, MRI, https://www.mayoclinic.org/tests-procedures/mri/about/pac-20384768 (last visited Mar. 26, 2021)). Raja testified that (1) an MRI is the definitive test for a spinal epidural abscess and (2) although a CT scan could show whether a different kind of abscess was present, a CT scan would not rule out a spinal epidural abscess. Raja also testified that after the CT scan came back normal, Stout still needed to order an MRI.

¶ 42　　　　　On cross-examination, Raja acknowledged that (1) spinal epidural abscesses are rare, (2) Allen had none of the risk factors associated with the disease, (3) symptoms such as fever and neck pain are nonspecific and can be indicative of many things other than a spinal epidural abscess, (4) Raja did not review the CT images, (5) Stout was entitled to rely on Dale's report that the CT scan was normal, and (6) if the CT scan had shown retropharyngeal processes extending down the midline of the C3 to C7 vertebra and evidence of spinal cord displacement, that would have been suggestive of a spinal epidural abscess.

¶ 43　　　　　Defendant objected to the opinions of both Kopin and Bernstein that Stout violated the emergency medicine standard of care, emphasizing that neither Kopin nor Bernstein were

- 9 -

emergency medicine physicians. However, the trial court overruled defendant's objections.

¶ 44        Kopin was an internal medicine doctor and hospital supervisor who testified that he had seen over two dozen spinal epidural abscesses over the course of his career. Kopin opined that the standard of care for any physician, regardless of specialty, required an MRI of Allen's cervical spine. Kopin also opined that no reasonable physician, regardless of specialty, would have ordered a CT scan in an attempt to look for a spinal epidural abscess because a CT scan would not show the spinal cord itself.

¶ 45        Bernstein was an orthopedic spine surgeon who testified that a reasonably careful spine surgeon would have immediately operated on Allen's spine on September 26 or 27 if an MRI had been conducted. Bernstein opined that if Allen had been operated on prior to September 28, it was more likely than not true that Allen would have spent five to seven days in the hospital, would have had a full neurological recovery, and would have returned to normal activities. Bernstein explained that he had reviewed the CT scan ordered by Stout multiple times and found it to be a normal scan and not diagnostic of a spinal epidural abscess. Bernstein opined that the medical community widely recognizes that (1) a CT scan is not the correct test to diagnose or rule out a suspicion of a spinal epidural abscess and (2) the standard of care requires an MRI. Bernstein stated that, in his experience, emergency department physicians normally order an MRI when they entertain a suspicion of a spinal epidural abscess.

¶ 46        Both Kopin and Bernstein testified that (1) Allen presented to Stout with the classic triad of symptoms for a spinal epidural abscess and (2) Stout should have ordered an MRI. Both testified that the spinal epidural abscess would have been apparent on an MRI. Throughout the testimony of Kopin and Bernstein, defendant raised multiple objections to the foundation for their standard of care opinions, but the trial court overruled all of those objections.

¶ 47                                    d. Lynn Dale's Deposition

¶ 48        Because Dale was unavailable to testify at trial, Allen submitted Dale's deposition testimony. Dale testified that he was on staff at defendant's hospital for 39 years. He also testified that (1) his reading of Allen's CT scan was within the standard of care for radiologists and (2) the CT scan did not contain evidence of a spinal epidural abscess. Dale opined that a gadolinium enhanced MRI is the test of choice for a suspected spinal epidural abscess. (We note the Mayo Clinic describes a gadolinium MRI as follows: "Contrast agents, including gadolinium (gad-oh-LIN-e-um), are used to enhance some MRI scans. Contrast agents are injected into a vein in your hand or arm." *MRI: Is Gadolinium Safe for People With Kidney Problems?*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/chronic-kidney-disease/expert-answers/gadolinium/faq-20057772 (last visited May 25, 2021) [https://perma.cc/U3F7-3Y6L].). Dale explained that a CT scan does not clearly define the spinal canal and a radiologist cannot see good detail of the spinal cord. Dale said he had never seen a spinal epidural abscess on a CT scan. Instead, every spinal epidural abscess he diagnosed was diagnosed via an MRI.

¶ 49                          3. *Defendant's Motion for Partial Directed Verdict*

¶ 50        After Allen rested his case-in-chief, defendant moved for a partial directed verdict for liability for the acts of any actual or apparent agent other than Stout. The trial court granted the partial directed verdict, citing its prior ruling that Allen could not proceed on a theory of liability against defendant premised on Dale's negligence.

¶ 51        However, the trial court also stated that Allen would be allowed to introduce evidence of Dale's apparent agency to rebut defendant's defense that Dale was the sole proximate cause of Allen's injury, explaining as follows:

            "And I think I indicated yesterday with the anticipation of the sole

- 11 -

proximate cause defense, which requires the defendant to provide evidence that a non-party is the sole proximate cause, I believe it would be appropriate to allow the plaintiff to show that Dr. Dale could be an apparent agent, which would take the non-party status out of the equation."

¶ 52                                    4. *Defendant's Evidence*

¶ 53                                    a. Allen as an Adverse Witness

¶ 54        Defendant called Allen as an adverse witness and asked him whether any of the advertising he saw from defendant mentioned the radiology services at the hospital or Dale specifically. Allen said he did not recall seeing any advertising that mentioned either Dale or the hospital's radiology services.

¶ 55        On cross-examination, Allen was shown an invoice for his CT scan and asked whether he received similar bills for radiology services from defendant that led him to believe the doctors were employees of the hospital. Allen agreed and stated he relied on defendant for complete care. On redirect examination, Allen acknowledged that he did not know if the invoice he received was for Dale's services specifically or if it was for the use of the hospital's facilities to perform the CT scan.

¶ 56                                    b. David Talan

¶ 57        David Talan, a medical doctor, testified that although an MRI is the best test when a spinal epidural abscess is suspected, a reasonable emergency department physician would not suspect or test for a spinal epidural abscess based on Allen's presentation on September 26, 2012. Talan testified that this was because (1) spinal epidural abscesses are rare, (2) Allen had none of the risk factors, and (3) Allen told Stout he had no fever for the past four days, no midline back pain, and no neurological symptoms.

¶ 58        Talan opined that it was reasonable to order a CT scan of the retropharyngeal tissues based upon Allen's complaints of a sore throat and pain when swallowing. Talan believed that the negative CT did not require a follow-up MRI because the redness in the back of Allen's throat explained the sore throat and the pain when swallowing. Talan opined that Stout did not deviate from the standard of care for an emergency room physician.

¶ 59        Talan acknowledged that (1) he taught residents and other physicians that a gadolinium MRI is the most sensitive radiology test for an epidural abscess and (2) a gadolinium MRI is recommended when a spinal epidural abscess is suspected. Talan also acknowledged that he does not tell his residents to order a CT scan to diagnose a spinal epidural abscess when an MRI is available.

¶ 60                                    c. Kishan Yalavarthi

¶ 61        Kishan Yalavarthi, a radiologist, testified that the epidural abscess was "obvious" on the CT scan and that any reasonable radiologist would have seen it. Yalavarthi explained that Dale failed to (1) identify the abscess and (2) recommend a follow-up MRI. Yalavarthi opined that Dale's interpretation of Allen's CT scan deviated from the standard of care for radiologists. Yalavarthi agreed that he could not remember a single time in his career that a CT scan had been used, despite an MRI being available, to look for a spinal epidural abscess. Yalavarthi said that Allen had the classic presentation of a spinal epidural abscess on September 26, 2012.

¶ 62                                    d. Derek Stout

¶ 63        Derek Stout testified that he was an emergency medicine physician at defendant's emergency department. He explained that he had a degree as a doctor of osteopathic medicine (DO) and that although the philosophy of doctors of osteopathic medicine differs from doctors of medicine (MD), they have the same privileges within hospitals and the same ability to treat and

diagnose illnesses. Stout did his residency in both internal medicine and emergency medicine and was board certified in both specialties.

¶ 64        Stout explained that, generally, when a patient presented at defendant's emergency department, he or she would first be seen by a triage nurse whose role was to determine the severity of the illness the person was experiencing and thus, "who needs to be seen more urgently and who can wait a little bit to be evaluated and seen." Stout continued that the patient would eventually be brought back to a room where another nurse would conduct an examination. Defendant's counsel asked, "[D]o you rely on just the history taken by a triage nurse for purposes of making a diagnosis or determining treatment?" Stout replied, "I do not." Stout explained that (1) there was a difference between the training of a nurse and a physician and (2) they may ask different kinds of questions.

¶ 65        Regarding Stout's treatment of Allen, Stout testified, "I absolutely did meet the standard of care." Stout said he would have had access to the triage nurse's notes and it was his custom and practice to look at those notes prior to treating a patient. Stout said that Allen told him, "about five to six days ago, he started—he was moving boxes and got right-sided neck pain. He had, I believe, in the previous note from the other physician, it said that he had felt a pop while he was moving boxes."

¶ 66        Stout testified that he wrote a note that Allen "state[d] he has not run any fever since [the last emergency department visit]." However, Stout acknowledged that the triage nurse wrote a note that said Allen "had [a] fever off and on." Stout explained that Allen never told him at any point that Allen had a fever on and off during the previous three or four days. Stout also testified that Allen never told him he was experiencing (1) pain in his spine that was shooting down into his waist, (2) pain that made him feel as though he was being shocked, or (3) a sensation of burning skin.

¶ 67 Stout testified that the risk factors for a spinal epidural abscess were (1) trauma, such as a spinal injury, spinal surgery, or a lumbar puncture; (2) age over 50 years; and (3) anything that causes a person to be immunocompromised. Stout said that Allen reported none of those risk factors to anyone at any time during his visit to the emergency department on September 26, 2012.

¶ 68 Stout testified that he ran several tests, including a complete blood count test that, in pertinent part, revealed that Allen had an elevated white blood cell count. Stout understood that this meant "there might be an infection, but I thought there probably was an infection anyways based on his symptoms and history that I got." The elevated white blood cell count could have been consistent with a viral infection. Stout also ordered a CT scan of Allen's neck and explained the reason he ordered the CT scan as follows:

> "That was his third visit back in the emergency department. He'd already had some blood work. He said that the pain continued. He was still having pain to the right side of his neck that hurt him to swallow. He was feeling miserable.
>
> At this point it could still be a viral syndrome, but I wanted to make sure that there was no evidence of any abscess or any other bad infection in the neck."

¶ 69 Stout explained that he "thought most likely we'd find an abscess more towards the front of the neck." Stout said that a sore throat or pain with swallowing was inconsistent with a spinal epidural abscess because pain from that kind of abscess usually "radiated in the back and in the mid line where the spinal canal is." At the time he ordered the CT scan, a spinal epidural abscess was on his differential diagnosis, "but it was extremely low" because Allen did not have any risk factors and his pain was in a different location than expected for that kind of abscess.

¶ 70 Stout testified that when he ordered a CT scan, he noted for the radiology department that Allen was suffering from throat and neck pain. He wrote for them to rule out an

"abscess," and he explained that he made that note intentionally nonspecific because "if you give radiologists a little bit too much information, it's possible that they may miss something that—because they are looking specifically at what you're requesting." Stout said that Dale reported no indication of an abscess.

¶ 71　　　　Stout said that he ordered a CT scan instead of an MRI because, "[b]ased on his complaints, history, physical, his risk factors, I thought [the chance of a spinal epidural abscess] was extremely low, and I didn't think [an MRI] was warranted or needed." Defense counsel asked Stout why he did not order an MRI after getting the reading back from Dale on the CT scan, and Stout said, "Same answer. Based on his risk factors, the history, my physical exam, now I have got a negative CT scan, I didn't feel that it was necessary."

¶ 72　　　　Stout said he met the standard of care when he ordered a CT scan and throughout his treatment of Allen. Stout said he relied upon Dale to interpret the CT scan. He explained, "I can look at [CT scans], but I don't ever base any of my information on anything other than a formal read from a radiologist."

¶ 73　　　　On cross-examination, Stout acknowledged that he suspected a spinal "epidural abscess could be in play" for Allen based on his "history and chief complaint." Allen asked, "There is no question as a principle of emergency department medicine that either a presumptive or confirmed spinal infection is an emergency situation, true?" Stout replied, "Yes." Stout agreed that an untreated spinal epidural abscess can result in paralysis or death. Allen asked, "A patient who has a presumptive epidural abscess with the stakes or risks as high as they are, that patient should have the clearest and best test to determine whether or not there is an epidural abscess, agreed?" Stout replied, "Yes."

¶ 74　　　　Allen confronted Stout with a passage from the 2010 edition of Rosen's Textbook

of Emergency Medicine (Rosen's), a book that Stout read in preparation for his deposition. Stout agreed that Rosen's was the most well-known emergency department text in the country. Allen read a passage from Rosen's that stated, "MRI is the imaging modality of choice, and needs to be performed emergently if the diagnosis [of a spinal epidural abscess] is entertained." Stout agreed that Rosen's said that but explained, "So a textbook, when it's published, can sort of be behind the time, and changes could have already happened. And maybe that's why there's new editions that come out." Allen then read from the 2002 and 2006 editions of Rosen's, in which the language was unchanged from the 2010 edition. Allen asked, "The preferred method for diagnosing a spinal epidural abscess is MRI with gadolinium, right?" Stout replied, "Yes."

¶ 75        Allen asked Stout, "If you had ordered an MRI on 9/26, either before the CT scan or after the CT scan, [Allen's] abscess would have been found, right?" Stout replied, "Yes."

¶ 76                    5. *Allen's Rebuttal Evidence*

¶ 77                        a. Patricia Peterson

¶ 78        Patricia Peterson testified that she was defendant's director of public relations and marketing, which meant that she was in charge of advertising for defendant. Peterson acknowledged that when people come to defendant's emergency department, they do not choose their doctor. Peterson also acknowledged that defendant made numerous advertisements, which included advertising for radiology services—and Lakeland Radiologists specifically—while using phrases such as "our doctors" and including Lakeland Radiologists alongside departments containing actual employees. The materials included a directory of physicians published by defendant that listed Dale of Lakeland Radiologists and identified him as a member of defendant's radiology department.

¶ 79        On cross-examination, Peterson said that Dale was not an employee of the hospital

but instead a Lakeland Radiology employee. Peterson said that defendant never advertised Dale as its employee.

¶ 80    On redirect examination, Peterson acknowledged that defendant never explicitly told the public that Lakeland Radiologists was an independent group not employed by the hospital.

¶ 81    6. *The Jury Instructions*

¶ 82    The trial court instructed the jury that Stout was defendant's agent at the time of the occurrence and that any act or omission by him was the act or omission of defendant. The court gave an issues instruction in which Allen identified six of Stout's acts or omissions that were a cause of Allen's injury. The instruction stated that Stout failed to (1) order an MRI, (2) order the proper radiology study, (3) properly diagnose Allen's condition, (4) order a sedimentation rate test, (5) perform a proper examination, and (6) get the proper consultation. The burden of proof instruction required Allen to prove one or more of Stout's acts or omissions was a proximate cause of Allen's injury.

¶ 83    The trial court gave Illinois Pattern Jury Instructions, Civil, No. 15.01 (2011) (hereinafter IPI Civil No. 15.01), defining proximate cause. It also gave Illinois Pattern Jury Instructions, Civil, No. 12.04 (2011) (hereinafter IPI Civil No. 12.04), which instructed the jury that it was not a defense if a nonparty shared the blame for Allen's injury unless that nonparty was "the sole proximate cause" of Allen's injury.

¶ 84    Although the trial court conducted a jury instruction conference that was off the record, the proceedings of that conference were set forth in a bystander's report. The bystander's report states, in pertinent part, the following:

    "A subject of significant argument during the jury instruction conference was the propriety of instructing the jury that the alleged apparent agency

- 18 -

relationship between [d]efendant and Dr. Dale in some way defeated [d]efendant's sole proximate cause defense. Defendant argued that since there were no apparent agency allegations in [p]laintiff's complaint that it was liable for the actions of Dr. Dale as his apparent principle [*sic*], it was impermissible to issue an instruction stating that a finding of an apparent agency relationship between [d]efendant and Dr. Dale would defeat [d]efendant's sole proximate cause defense.

The parties having been unable to reach agreement on this issue, the [c]ourt retired to chambers and drafted a modified 105.11 instruction, which it presented to the parties for review, revision and further discussion.

Plaintiff ultimately adopted and tendered the court's modified IPI 105.11 as [p]laintiff's #18.

\* \* \*

[The next morning, December 13, 2019], the court held another jury instruction conference prior to the start of proceedings. \*\*\* Plaintiff tendered at that time two versions of modified IPI 105.11 that tracked the form and substance of the modified IPI 105.11 drafted and distributed by the court the evening before. Those instructions were [p]laintiff's #18 and [p]laintiff's #18-A. Defendant did not tender any alternate IPI 105.11 or modified IPI 105.11 instruction. Defendant continued objecting to giving any version of IPI 105.11 on the basis that it could not be held liable for Dr. Dale's conduct on the basis of apparent agency, and therefore any instruction that Dr. Dale's purported agency defeated or negated the defendant's sole proximate cause defense was improper. At the conclusion of the informal conference, the court indicated that when it went back on the record, it

would deny [p]laintiff's #18-A and allow [p]laintiff's #18 over [d]efendant's objection."

¶ 85 The instruction told the jury that defendant claimed Dale was the sole proximate cause of Allen's injury and that Allen claimed Dale was defendant's apparent agent. The jury was instructed on the elements of apparent agency and told that if it found Dale was defendant's apparent agent, it "must not consider [defendant's] argument that Lynn Dale, M.D. was the sole proximate cause of the injury to [Allen]." Instruction No. 18 further told the jury that if it found Dale was not defendant's apparent agent, then it "may" consider defendant's argument that Dale was the sole proximate cause of Allen's injury.

¶ 86                                    7. *Closing Arguments*

¶ 87 In closing arguments, Allen referred to the sole proximate cause defense as a "Hail Mary" and told the jury that "[t]he lawyers [for defendant] cooked that up." Defendant objected to the "cooked up" comment, and the trial court sustained that objection.

¶ 88 Allen also discussed instruction No. 18 in closing and said that if the jury found Dale was the hospital's apparent agent, it "must" disregard the hospital's sole proximate cause defense. Allen continued that if the jury found Dale was not the hospital's apparent agent, "[Y]ou may consider—you may—not you must. And there's a significant difference between these paragraphs. You may consider [defendant's] argument that Lynn Dale was the sole proximate cause, not that you have to."

¶ 89 The jury returned a $14 million verdict in favor of Allen.

¶ 90                                    8. *Posttrial Motions*

¶ 91 Defendant filed a combined posttrial motion for a new trial and remittitur, arguing, in part, that the trial court erred by (1) ruling that defendant's sole proximate cause defense could

be defeated by a finding that Dale was defendant's apparent agent and (2) allowing Bernstein and Kopin to opine as to the emergency medicine standard of care. Defendant also argued that it was entitled to a new trial because of Allen's counsel's "pervasive and prejudicial misconduct."

¶ 92    In July 2020, the trial court filed a detailed, 13-page written order denying defendant's posttrial motion in its entirety. We note that this thoughtful and comprehensive order was very helpful for this court in our analysis of the issues on appeal.

¶ 93    This appeal followed.

¶ 94                                    II. ANALYSIS

¶ 95    Defendant appeals, arguing that (1) the trial court erred by instructing the jury that defendant's sole proximate cause defense could not be based on the act of a nonparty apparent agent, (2) the trial court erred by allowing Kopin, an internist, and Bernstein, an orthopedic surgeon, to testify regarding the standard of care for an emergency department physician, and (3) defendant was deprived of a fair trial because of Allen's counsel's pervasive misconduct. We disagree and affirm.

¶ 96            A. The Trial Court Did Not Err by Giving Jury Instruction No. 18

                        Regarding the Sole Proximate Cause Defense

¶ 97    First, defendant argues that the trial court committed reversible error by giving jury instruction No. 18 to the jury, which instructed the jury to not consider defendant's sole proximate cause defense if the jury concluded that Dale was defendant's apparent agent. Defendant contends that this instruction was a misstatement of the law. We disagree because (1) instruction No. 18 correctly stated the law and (2) the two-issue rule precludes relief. Either of these reasons would result in this court's affirming the trial court.

¶ 98            1. *Instruction No. 18 Correctly Stated the Law Regarding the Sole*

¶ 99                                a. The Sole Proximate Cause Defense

¶ 100        "A defendant raising the sole proximate cause defense seeks to defeat a plaintiff's claim of negligence by establishing proximate cause solely in the act of another not a party to the suit. Accordingly, this defense is aptly referred to as the 'empty chair' defense." *McDonnell v. McPartlin*, 192 Ill. 2d 505, 516, 736 N.E.2d 1074, 1082 (2000).

¶ 101        The First District recently explained the sole proximate cause defense in the context of a medical malpractice case in *Ghostanyans v. Goodwin*, 2021 IL App (1st) 192125, ¶ 74. The court stated the following:

> "A defendant may not only rebut evidence tending to show that his or her acts were negligent and the proximate cause of the plaintiff's alleged injuries, but also may try to establish by competent evidence that the conduct of a third person, or some other causative factor, was the sole proximate cause of those injuries. *** A party has the right to have the jury fully instructed on any theory of the case supported by evidence, however slight. *** A defendant need not show that the other person's actions were negligent, only that those actions were the sole proximate cause of the plaintiff's injuries." *Id.*

This court recently discussed the sole proximate cause defense in *Arkebauer v. Springfield Clinic*, 2021 IL App (4th) 190697, ¶¶ 71-72, which was also a medical malpractice case.

¶ 102        IPI Civil No. 12.04 discusses the sole proximate cause defense in the long form of the instruction, which reads as follows:

> "12.04 Concurrent Negligence Other Than Defendant's
>
>         More than one person may be to blame for causing an injury. If you decide

that a [the] defendant[s] was [were] negligent and that his [their] negligence was a proximate cause of injury to the plaintiff, it is not a defense that some third person who is not a party to the suit may also have been to blame.

[However, if you decide that the sole proximate cause of injury to the plaintiff was the conduct of some person other than the defendant, then your verdict should be for the defendant.]"

¶ 103 Although sole proximate cause is a defense, it is not an affirmative defense, and it does not shift the burden of proof. The Illinois Supreme Court has explained why, writing the following:

"In any negligence action, the plaintiff bears the burden of proving not only duty and breach of duty, but also that defendant proximately caused plaintiff's injury. [Citations.] The element of proximate cause is an element of the *plaintiff's* case. The defendant is not required to plead lack of proximate cause as an affirmative defense. [Citation.] Obviously, if there is evidence that negates causation, a defendant should show it. However, in granting the defendant the privilege of going forward, also called the burden of production, the law in no way shifts to the defendant the burden of proof. [Citations.]

***

*** The sole proximate cause defense merely focuses the attention of a properly instructed jury *** on the plaintiff's duty to prove that the defendant's conduct was a proximate cause of plaintiff's injury." (Emphasis in original.) *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 93-94, 658 N.E.2d 450, 455 (1995).

¶ 104          b. Apparent Agency and the Sole Proximate Cause Defense

¶ 105          Defendant contends that a sole proximate cause defense is not precluded even when the third party who a defendant claims is the sole proximate cause of the plaintiff's injury is the defendant's agent. Upon questioning at oral argument, defendant's counsel plainly stated that defendant believed the defense was proper even if the third party was defendant's *actual* agent, not merely defendant's *apparent* agent. For the reasons we discuss below, we reject this contention for both kinds of agents. See *infra* ¶¶ 112-15. However, we also wish to note that actual and apparent agents, in the context of the sole proximate cause defense, are treated the same under the law.

¶ 106          It is well settled that apparent agents are treated identically to actual agents once a finding of apparent agency has been made. The Illinois Supreme Court has written the following:

> "A principal will be bound not only by that authority which he actually gives to another, but also by the authority which he appears to give. Apparent authority in an agent is the authority which the principal knowingly permits the agent to assume, or the authority which the principal holds the agent out as possessing. *** Where the principal creates the appearance of authority, the principal 'will not be heard to deny the agency to the prejudice of an innocent party, who has been led to rely upon the appearance of authority in the agent.' " *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 523-24, 622 N.E.2d 788, 795 (1993) (quoting *Union Stock Yard & Transit Co. v. Mallory, Son & Zimmerman Co.*, 157 Ill. 554, 565, 41 N.E. 888, 891 (1895)).

See also *Bosch v. NorthShore University Health System*, 2019 IL App (1st) 190070, ¶ 87, 155 N.E.3d 486 (stating that under the doctrine of apparent agency, "the purported agent does not

possess *actual* authority to act on behalf of the principal, but the principal, by some manifestation to a third party or the public, has 'cloaked' the agent in such a way to give the reasonable impression that the agent has actual authority" (emphasis in original)); *Perez v. St. Alexius Medical Center*, 2020 IL App (1st) 181887, ¶ 81 ("Under the doctrine of apparent agency, when a physician is not an employee of the hospital but is an independent contractor, a hospital may be held liable for a physician's negligence.").

¶ 107       In addition, the Restatement (Second) of Agency states the following:

>           "One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent *as if he were such*." (Emphasis added.) Restatement (Second) of Agency § 267 (1958).

¶ 108                              c. The Law of Jury Instructions

¶ 109       "Generally, a trial court's decision to grant or deny [a jury] instruction is reviewed for abuse of discretion." *Studt v. Sherman Health Systems*, 2011 IL 108182, ¶ 13, 951 N.E.2d 1131. A court acts within its discretion so long as the instructions, "taken as a whole *** fairly, fully, and comprehensively apprised the jury of the relevant legal principles." (Internal quotation marks omitted.) *Pister v. Matrix Service Industrial Contractors, Inc.*, 2013 IL App (4th) 120781, ¶ 74, 998 N.E.2d 123. The First District further explained this issue in *Ghostanyans*, 2021 IL App (1st) 192125, ¶ 78, in which it wrote the following:

>           "A jury instruction is justified if it is supported by some evidence in the record, and the trial court has discretion in deciding which issues are raised by the evidence. [Citation.] In reviewing a jury instruction issue, we consider whether the

instructions, as a whole, fairly and comprehensively inform the jury of the relevant legal principles. [Citation.] Even where an instruction is faulty, we will not reverse unless the instructions clearly misled the jury and prejudiced the appellant."

¶ 110    d. The Text of Instruction No. 18 Regarding the Sole Proximate Cause Defense

¶ 111    The trial court provided the jury with instruction 18, which was a modified version of Illinois Pattern Jury Instruction, Civil, No. 105.11 (2011) (hereinafter IPI Civil No. 105.11), that reads as follows:

> "In the present case, Sarah Bush Lincoln Health Center alleges that the conduct of Lynn Dale, M.D. is the sole proximate cause of the injury to Mark Allen.
>
> Mark Allen alleges that Lynn Dale, M.D. was an apparent agent of Sarah Bush Lincoln Health Center. Sarah Bush Lincoln Health Center denies that Lynn Dale, M.D. was its apparent agent.
>
> In order for an apparent agency relationship to have existed, Mark Allen must prove the following:
>
> First, that Sarah Bush Lincoln Health Center held itself out as a provider of medical care and that Mark Allen neither knew nor should have known that Lynn Dale, M.D. was not an agent or employee of Sarah Bush Lincoln Health Center.
>
> Second, that Mark Allen did not choose Lynn Dale, M.D. but relied upon Sarah Bush Lincoln Health Center to provide him medical care.
>
> If you find that Lynn Dale, M.D. was the apparent agent of Sarah Bush Lincoln Health Center at the time of the occurrence, then you must not consider Sarah Bush Lincoln Health Center's argument that Lynn Dale, M.D. was the sole proximate cause of the injury to Mark Allen.

If you find that Lynn Dale, M.D. was not the apparent agent of Sarah Bush Lincoln Health Center at the time of the occurrence, then you may consider Sarah Bush Lincoln Health Center's argument that Lynn Dale, M.D. was the sole proximate cause of the injury to Mark Allen."

¶ 112                                    e. This Case

¶ 113        We conclude that instruction No. 18 properly stated the law. Instruction No. 18 was a revised version of IPI Civil No. 105.11, the committee notes to which state the following: "This instruction should be used where the issue of apparent agency is in dispute, the principal alone is sued, and plaintiff alleges reliance upon a 'holding out' on the part of the principal." IPI Civil No. 105.11, Notes on Use. Defendant argues that it was improper to include the language instructing the jury that if it found Dale was defendant's apparent agent, the jury "must not" consider the sole proximate cause defense, but if it found that Dale was not defendant's apparent agent then it "may" consider the sole proximate cause defense.

¶ 114        We note that IPI Civil No. 12.04 was also given to the jury and explains the sole proximate cause defense. It states, in pertinent part, "However, if you decide that the sole proximate cause of injury to the plaintiff was the conduct of some person other than the defendant, then your verdict should be for the defendant." IPI Civil No. 12.04. The committee notes on use for IPI 12.04 state, in relevant part, "This instruction should be used only where negligence of a person who is not a party to the suit may have concurred or contributed to cause the occurrence. *This instruction may not be used where the third person was acting as the agent of the defendant or the plaintiff.*" (Emphasis added.) IPI Civil No. 12.04, Notes on Use. In other words, (1) the committee notes on use for IPI Civil No. 12.04 state that the sole proximate cause defense does not apply when the third party whose conduct was allegedly the sole proximate cause of the

plaintiff's injury was an agent of the defendant and (2) apparent agents are treated the same as actual agents regarding the sole proximate cause defense. Additionally, whether Dale was defendant's apparent agent (1) was at issue and (2) was a matter to be decided by the jury. Thus, the trial court informed the jury through instruction No. 18 that if it decided Dale was defendant's apparent agent, the sole proximate cause defense would not apply. This modification to IPI Civil No. 105.11 essentially did nothing more than incorporate the principle stated by the committee notes on use for IPI Civil No. 12.04. Accordingly, we conclude that instruction No. 18 correctly informed the jury that if it found Dale was defendant's apparent agent, the sole proximate cause defense was unavailable.

¶ 115        Defendant also disagrees with instruction No. 18's use of the word "may" in informing the jury that if it found that Dale was not defendant's apparent agent, it "may" consider the sole proximate cause defense. However, this contention is about the wording of instruction No. 18, not whether the trial court should have given the instruction at all. Defendant could have (1) submitted an instruction that used a word other than "may" or (2) offered other modifications to proposed instruction No. 18. Because defendant chose to not do so, we conclude that (1) defendant has forfeited this argument and (2) any prejudice defendant claims to have suffered from this wording is entirely speculative.

¶ 116                              2. *The Two-Issue Rule*

¶ 117        Allen argues that the two-issue rule precludes a new trial. We agree.

¶ 118                              a. The Law

¶ 119        "Illinois courts, like the courts of most states [citation], have adopted the 'two issue' rule." *Strino v. Premier Healthcare Associates, P.C.*, 365 Ill. App. 3d 895, 904, 850 N.E.2d 221, 229 (2006). The two-issue rule, codified in section 2-1201(d) of the Code of Civil Procedure,

states, in pertinent part, as follows:

> "If several grounds of recovery are pleaded in support of the same claim, whether in the same or different counts, an entire verdict rendered for that claim shall not be set aside or reversed for the reason that any ground is defective, if one or more of the grounds is sufficient to sustain the verdict ***." 735 ILCS 5/2-1201(d) (West 2018).

¶ 120　"When there is a general verdict and more than one theory is presented, the verdict will be upheld if there was sufficient evidence to sustain either theory, and the [moving party], having failed to request special interrogatories, cannot complain." (Internal quotation marks omitted.) *Lazenby v. Mark's Construction, Inc.*, 236 Ill. 2d 83, 101, 923 N.E.2d 735, 747 (2010); see also *Obermeier v. Northwestern Memorial Hospital*, 2019 IL App (1st) 170553, ¶ 51, 134 N.E.3d 316 (quoting *Lazenby* approvingly and applying its holding to the medical malpractice case before it). In *Obermeier*, the First District Appellate Court rejected the plaintiff's argument, which challenged the jury's verdicts in favor of the defendants because the plaintiff did not request that the jury be given any special interrogatories. The First District noted that this rule applies to both the plaintiff and defendant. *Obermeier*, 2019 IL App (1st) 170553, ¶ 51.

¶ 121　"Moreover, when multiple defenses are raised, a general verdict rendered by a jury creates a presumption that the jury found in favor of the winning party on every defense raised." *Great American Insurance Co. of New York v. Heneghan Wrecking & Excavating Co.*, 2015 IL App (1st) 133376, ¶ 15, 46 N.E.3d 859.

> "In sum, the supreme court's rulings with regard to general verdicts provide that when multiple claims, theories, or defenses were presented to the jury, without the submission of special interrogatories or separate verdict forms, the return of a

general verdict creates a presumption that the evidence supported at least one of the claims, theories, or defenses and will be upheld." *Id.*

¶ 122　　The two-issue rule requires that, in such circumstances, a party must submit special interrogatories to determine whether any error in an alleged erroneous instruction could have affected the verdict. *Strino*, 365 Ill. App. 3d at 904-05. A special interrogatory is in proper form when it "consists of a *single*, direct question that, *standing on its own*, is dispositive of an issue in the case such that it would, *independently*, control the verdict with respect thereto." (Emphases in original.) *In re Commitment of Haugen*, 2017 IL App (1st) 160649, ¶ 30, 87 N.E.3d 346.

¶ 123　　In *Tabe v. Ausman*, 388 Ill. App. 3d 398, 902 N.E.2d 1153 (2009), the appellate court dealt with an issue similar in nature to the one we now face. *Tabe* involved a spinal compression and a possibly faulty MRI. *Id.* at 399-402. The defendant doctors argued at trial that a neuroradiologist was the sole proximate cause of the plaintiff's injury. *Id.* at 401. The jury found in favor of the defendant doctors and issued a general verdict. *Id.* The trial court granted a new trial because it believed it had erred by giving the long form of IPI Civil No. 12.04 despite the fact that, in the trial court's view, no evidence had been presented that the doctors relied on the neuroradiologist. *Id.* at 401-02.

¶ 124　　The *Tabe* court noted that this verdict could have been because the jury decided (1) the MRI films showed no nerve compression or (2) the MRI films showed nerve compression but the neuroradiologist failed to report nerve compression. *Id.* at 402-03. The First District explained that the trial court should have considered whether the jury's verdict could have been explained by a finding of no negligence against the defendant doctors because, "[i]f there was no negligence, then instructing on sole proximate cause did not matter." *Id.* at 404. "Following *Strino,* in the absence of special interrogatories answering whether the plaintiff proved

negligence based on the MRI films disclosing a nerve compression, we cannot determine from the general verdict whether the sole proximate cause instruction made any difference." *Id.* The court concluded as follows: "We find the circuit court erred in granting the plaintiff a new trial based on the sole proximate cause instruction where the jury might well have concluded that the defendant doctors were not negligent in returning its general verdict in favor of the defendants." *Id.* at 405.

¶ 125                                    b. This Case

¶ 126        Allen contends that the two-issue rule applies to this case because (1) the jury issued a general verdict in his favor, (2) the jury was instructed on multiple theories of negligence based upon Stout's conduct, and (3) defendant failed to request a special interrogatory that might have clarified the jury's findings. Defendant responds that the two-issue rule does not apply because (1) a finding that Dale's acts were the sole proximate cause of Allen's injuries would have precluded a verdict against defendant on all of the presented theories and (2) defendant could not have submitted a special interrogatory in proper form to test the basis of the jury's verdict. We disagree with defendant.

¶ 127        In defendant's reply brief, defendant asserts, "Where the appellant challenges all of the theories on which the jury's verdict might rest, *** the [two-issue] rule does not apply." Clearly, however, defendant is not in fact challenging *all* of the theories on which the jury's verdict might rest in the manner that the two-issue rule requires. In other words, a theory upon which the jury in this case could have rested its verdict exists and is not challenged on appeal by defendant. Specifically, on this record, the jury could have concluded that Stout was negligent for actions he took *before* Dale took any action in relation to Allen or his care.

¶ 128        Allen notes that the jury was instructed on several theories of negligence based upon Stout's conduct alone—namely, that Stout failed to (1) order an MRI, (2) order the proper

radiology study, (3) properly diagnose Allen's condition, (4) order a sedimentation rate test, (5) perform a proper examination, and (6) get the proper consultation.

¶ 129       If the jury agreed, for example, that Stout was negligent because he failed to perform a proper examination of Allen, then nothing about the alleged errors in instruction No. 18 could have affected the jury's verdict. Under those circumstances, the jury could not have logically concluded Stout was a proximate cause of Allen's injury and also have concluded that Dale was the *sole* proximate cause.

¶ 130       Essentially, defendant's contentions amount to nothing more than that the jury erred by rejecting defendant's sole proximate cause defense. Because defendant failed to request a special interrogatory that would have revealed whether the jury relied upon instruction No. 18 in reaching its verdict, the two-issue rule precludes reversal based upon defendant's claim that instruction No. 18 was erroneously given to the jury.

¶ 131       We similarly disagree with defendant's contention that the two-issue rule does not preclude review because we conclude that defendant could have submitted a special interrogatory in proper form to test the basis of the jury's verdict. In *Simmons v. Garces*, 198 Ill. 2d 541, 563, 763 N.E.2d 720, 734-35 (2002), a medical malpractice case, the Illinois Supreme Court wrote the following:

> "[A] special interrogatory is in proper form if (1) it relates to an ultimate issue of fact upon which the rights of the parties depend, and (2) an answer responsive thereto is inconsistent with some general verdict that might be returned. [Citations.] In addition, it should be a single question, stated in terms that are simple, unambiguous, and understandable; it should not be repetitive, confusing, or misleading. [Citation.] It need not contain all of the elements of negligence and is

proper if it focuses on one element that is dispositive of the claim."

The First District similarly discussed this principle in *Ghostanyans*, 2021 IL App (1st) 192125, ¶ 83, in which it wrote,

> "The purpose of a special interrogatory is to be a check on the general verdict, testing it against the jury's determination of one or more specific issues of ultimate fact. [Citation.] A special interrogatory is proper if (1) it relates to an ultimate issue of fact and (2) at least one of the answers would be inconsistent with one of the general verdict options."

¶ 132    Defendant contends that it could not create a single direct question that would be dispositive of an issue in the case such that it would control the verdict. Defendant argues as follows:

> "A special interrogatory requiring the jury to determine whether Dr. Dale's conduct was the sole proximate cause of plaintiff's injuries would be confusing where Instruction #18 directed that the jury 'must not consider' sole proximate cause if it found Dr. Dale to be an apparent agent. And the answer to such an interrogatory would not control the verdict: the jury could have returned a verdict in plaintiff's favor by finding that Dr. Dale's conduct was not the sole proximate cause *or* by finding that Dr. Dale's conduct was the sole proximate cause but that he was the hospital's apparent agent."

¶ 133    Insofar as defendant claims it was unable to create a proper special interrogatory because instruction No. 18 was unclear, that was a problem—at least in part—of defendant's own making. Defendant first objected to giving the instruction altogether, and when the trial court determined the instruction should be given, defendant never made any attempt to supply a version

of the instruction defendant would deem sufficiently clear. Accordingly, defendant forfeited any argument that the wording of instruction No. 18 prevented it from submitting a special interrogatory.

¶ 134   Moreover, defendant could have requested a proper special interrogatory based upon the language of instruction No. 18. For instance, the special interrogatory could have read, "Were Dr. Dale's acts or omissions the sole proximate cause of plaintiff's injuries?" If the jury said, "No," then the jury would have necessarily decided that defendant was liable because of Stout. If the jury said, "Yes," then the only way that the jury could have found for Allen is if it thought that Dale was also the hospital's apparent agent—precisely the theory of liability for which defendant now claims instruction No. 18 misled the jury.

¶ 135   We conclude that the two-issue rule applies in this case and, because defendant failed to request a special interrogatory be submitted to the jury, defendant has forfeited its claim that instruction No. 18 was erroneously given to the jury.

¶ 136   B. The Trial Court Did Not Err by Allowing an Internist and a Spinal Surgeon to Opine Regarding the Standard of Care for Emergency Physicians

¶ 137   Next, defendant contends that the trial court erred by allowing Kopin, an internist, and Bernstein, a spinal surgeon, to opine about the standard of care for emergency physicians because Allen failed to lay adequate foundation. We disagree.

¶ 138   1. *The Law*

¶ 139   " 'In Illinois, generally, an individual will be permitted to testify as an expert if his experience and qualifications afford him knowledge which is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion.' " *People v. Lerma*, 2016 IL 118496, ¶ 23, 47 N.E.3d 985 (quoting *People v. Enis*, 139 Ill. 2d 264, 288, 564 N.E.2d 1155,

- 34 -

1164 (1990)). " 'There are no precise requirements regarding experience, education, scientific study, or training' of a proposed expert." *People v. Beck*, 2017 IL App (4th) 160654, ¶ 113, 90 N.E.3d 1083 (quoting *People v. Lovejoy*, 235 Ill. 2d 97, 125, 919 N.E.2d 843, 859 (2009)).

¶ 140　　　　In *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 114-15, 809 N.E.2d 645, 655 (2004), the Illinois Supreme Court explained the foundation requirements for a physician to provide an opinion as to a medical standard of care. In that case, the plaintiff argued that the Illinois Supreme Court had retreated from a rigid rule "that a health professional expert witness must always be a licensed member of the school of medicine about which the expert proposes to testify." *Id.* at 114. The court rejected that argument, writing the following:

> "*Jones* clearly reaffirms this court's decision in *Purtill* describing *two* foundational requirements: that the health-care expert witness must be a licensed member of the school of medicine about which the expert proposes to testify; and that the expert must be familiar with the methods, procedures, and treatments ordinarily observed by other health-care providers in either the defendant's community or a similar community. *** It is only *after* determining that both foundational requirements are satisfied that the court proceeds to evaluate whether the allegations of negligence concern matters within the expert's knowledge and observation. Instead of retreating from the license requirement, *Jones* clearly reaffirms that a plaintiff must satisfy both requirements." (Emphases in original.) *Id.* at 114-15.

¶ 141　　　　The Illinois Supreme Court's decision to which the *Sullivan* court referred, *Jones v. O'Young*, 154 Ill. 2d 39, 43, 607 N.E.2d 224, 225-26 (1992), states the following:

> "First, the physician must be a licensed member of the school of medicine about which he proposes to testify. [Citation.] Second, the expert witness must show that

he is familiar with the methods, procedures, and treatments ordinarily observed by other physicians, in either the defendant physician's community or a similar community. [Citation.] Once the foundational requirements have been met, the trial court has the discretion to determine whether a physician is qualified and competent to state his opinion as an expert regarding the standard of care." (Internal quotation marks omitted.)

¶ 142 In *Jones*, the Illinois Supreme Court was tasked with answering a certified question of law that stated the following:

"In order to testify concerning the standard of care required of and deviations from the standard of care by a defendant physician specializing in an area of medicine, must the plaintiff's expert also specialize in the same area of medicine as the defendant, so that, in this case, the plaintiff's infectious disease specialist would not be qualified to testify against the defendant plastic surgeon, orthopedic surgeon, or general surgeon with regard to each defendant's care and treatment of the infectious disease, Pseudomonas osteomyelitis?" (Internal quotation marks omitted.) *Id.* at 42-43.

¶ 143 The Illinois Supreme Court concluded by saying, "We answer the question certified by the trial court in this matter in the negative and in so doing, reaffirm this court's decisions in *Purtill v. Hess*[, 111 Ill. 2d 229, 489 N.E.2d 867 (1986)]." *Id.* at 48.

¶ 144 2. *The Standard of Review Regarding a Trial Court's Ruling That a Physician*
*May Testify as an Expert Witness*

¶ 145 Defendant argues, in two separate ways, that the standard of review to be applied is *de novo*. We address each in turn.

¶ 146                                  a. *De Novo* Review for the Entire Inquiry

¶ 147        Defendant contends that the standard of review of the trial court's ruling that

Allen's proffered physicians could testify as expert witnesses is *de novo*. In support, defendant

cites *Ittersagen v. Advocate Health & Hospitals Corp.*, 2020 IL App (1st) 190778, ¶ 70, and argues

the following in its brief:

> "Thus, Illinois courts 'have stated that the foundational requirements of an expert's
>
> qualifications are reviewed as a matter of law *de novo*.' *Ittersagen v. Advocate*
>
> *Health & Hosp[itals] Corp.*, 2020 IL App (1st) 190778, ¶ 70 (citing *Roach v. Union*
>
> *[Pacific] R.R.*, 2014 IL App (1st) 132015, ¶ 51 and *McWilliams* [*v. Dettore*], 387
>
> Ill. App. 3d [833,] 844[, 901 N.E.2d 1023, 1031 (2009)])."

However, that quotation is not complete. The full sentence reads as follows:

> "While our courts have stated that the foundational requirements of an
>
> expert's qualifications are reviewed as a matter of law *de novo* (see *Roach v. Union*
>
> *Pacific R.R.*, 2014 IL App (1st) 132015, ¶ 51[, 19 N.E.3d 61]; *McWilliams v.*
>
> *Dettore*, 387 Ill. App. 3d 833, 844[, 901 N.E.2d 1023] (2009)), it has also been said
>
> that a trial court's determination regarding whether someone is qualified to testify
>
> as a medical expert is ultimately reviewed for an abuse of discretion (see *Gill* [*v.*
>
> *Foster*], 157 Ill. 2d [304,] 317[, 626 N.E.2d 190, 196 (1993)]; *Ayala v. Murad*, 367
>
> Ill. App. 3d 591, 597[, 855 N.E.2d 261, 267] (2006))." *Ittersagen*, 2020 IL App
>
> (1st) 190778, ¶ 70.

¶ 148        Although it is true, as *Ittersagen* states, that the First District has on at least one

occasion, in *Roach*, applied a *de novo* standard of review in these circumstances, we reject

defendant's contention that this court should do so because we respectfully disagree with *Roach*

that a *de novo* standard of review applies to the trial court's ruling at issue. The Illinois Supreme Court has never applied a *de novo* standard of review to a trial court's permitting a physician or any other proffered expert to testify as an expert witness. Instead, the Illinois Supreme Court has always applied the abuse of discretion standard, and we disagree with the First District that any language in *Jones* or *Sullivan* permits a deviation from applying that standard.

¶ 149        b. *De Novo* Review of the Foundational Requirements

¶ 150   In further support of defendant's contention that a *de novo* standard of review applies, defendant cites *Alm v. Loyola University Medical Center*, 373 Ill. App. 3d 1, 866 N.E.2d 1243 (2007), a decision of the First District Appellate Court. In that medical malpractice case, the plaintiff appealed from the trial court's grant of the defendant doctor's motion *in limine* that barred plaintiffs' liability expert (Dr. James Bryant) from testifying to two opinions regarding areas outside the scope of his expertise—specifically, the standard of care applicable to the defendant physicians or alleged deviations from the standard of care by the alleged physicians. *Id.* at 2. After the trial court granted the defendant's motion *in limine*, the trial court then granted defendants' motion for summary judgment.

¶ 151   The First District in *Alm* discussed the three-step analysis set forth in *Purtill* that a trial court should follow in determining whether a medical expert should be allowed to testify and noted that this three-step analysis was later summarized by the supreme court as containing " 'two foundational requirements of licensure and familiarity, and [a] discretionary requirement of competency.' " *Id.* at 4 (quoting *Sullivan*, 209 Ill. 2d at 115). The *Alm* court then wrote the following:

> "[T]he analysis that a trial court performs to determine whether a medical expert is qualified involves the following three steps:

(1) the expert must be a licensed member of the school of medicine about which the expert proposes to express an opinion;

(2) The expert must be familiar with the methods, procedures, and treatments ordinarily observed by other physicians; and

(3) the trial court has the discretion to determine whether the physician is qualified and competent to state his opinion regarding the standard of care.

[Citations.] Thus, the first two steps are foundational requirements and form a threshold determination. [Citation.] If this threshold determination is not met, the analysis ends and the trial court must disallow the expert's testimony. [Citation.] If, on the other hand, the foundation is laid, the trial court proceeds to the third step. In other words, even if the first two steps are met, the trial court has discretion to determine if the particular expert is competent to testify in the particular case before the court. This third step, the so-called 'competency' requirement, has been explained as follows: It is only after determining that both foundational requirements are satisfied that the court proceeds to evaluate whether the allegations of negligence concern matters within the expert's knowledge and observation. [Citation.] Therefore, the third step involves the trial court exercising its discretion in deciding whether the expert witness is competent to testify to the particular medical problem involved in the allegations at issue, *i.e.*, to the issues at hand." (Internal quotation marks omitted.) *Id.* at 5.

¶ 152 Based on the above, defendant argues that different standards of review apply to the foundational requirements for expert witnesses—namely, the two foundational requirements

are subject to a *de novo* standard of review, while the third step—the so-called "competency" requirement—is subject to a discretionary standard of review. However, defendant cites no case that has ever so held, and we are not persuaded that defendant's analysis is correct. In fact, we deem *Alm* no support at all for defendant's claim because the trial court in that case concluded that plaintiff's proffered expert, Dr. Bryant, was not familiar with "the methods, procedures, and treatments ordinarily observed by other physicians, including the defendant physicians." *Id.* at 5. By defendant's own citation to *Alm*, this is the *second* step in the three-pronged analysis to determine whether a physician may testify as an expert witness, not the third prong—the so-called "competency prong." According to defendant, this second step should be subject to a *de novo* standard of review. Yet, the *Alm* court made clear that it was not applying a *de novo* standard of review regarding the trial court's rejection of Dr. Bryant as an expert witness. The *Alm* court wrote the following:

> "[Dr. Bryant] was unable to identify the standard of care for the discharge of a postoperative patient following cleft lip repair from a hospital or for the discharge of any patient following a plastic surgery procedure. We cannot say that the trial court *abused its discretion* in determining that Dr. Bryant was not competent to testify to the issues at hand." (Emphasis added.) *Id.* at 6.

¶ 153 Accepting the *Alm* court's three-pronged analysis as correct, we conclude that the deferential standard of review applies to all three prongs. Accordingly, we reject defendant's claim that *de novo* review applies in this case.

¶ 154                                    3. *This Case*

¶ 155 Defendant argues that Allen failed to lay a sufficient foundation that either Kopin or Bernstein had sufficient (1) familiarity or (2) competency to render their opinions as to the

standard of care for emergency room physicians. We disagree.

¶ 156    We need not reiterate Kopin and Bernstein's qualifications and experience. See *supra* ¶¶ 43-46. We will simply note that Kopin testified he (1) went to the emergency department every day, (2) did a three-month rotation in an emergency department during his residency, (3) was the chief medical officer of one of the four regions of Northwestern Medicine, (4) taught emergency medicine physicians and residents, (5) met with emergency department leadership on a weekly basis, and (6) had seen over two dozen spinal epidural abscesses in his career.

¶ 157    Additionally, Bernstein testified he (1) frequently consulted with emergency department physicians for conditions related to the spine since 1991, (2) was a clinical professor of orthopedic surgery at the University of Illinois, (3) was board certified as an independent medical examiner, and (4) had "emergency room doctors call [him] and ask [him] for [his] opinion as to what test to get [for a suspected spinal epidural abscess] based on the symptoms [the patients] have."

¶ 158    Defendant argues that neither Kopin nor Bernstein had ever been called upon to diagnose a patient in an emergency room who presented as did Allen in this case. Instead, they were consulted only when a diagnosis of spinal epidural abscess had either already been made or was strongly suspected. Defendant contends that Bernstein in particular had relatively little experience with emergency medicine. However, "[a]n abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable, such that no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *Beck*, 2017 IL App (4th) 160654, ¶ 114.

¶ 159    Although it is possible that other trial courts may have found the foundation in this case for the testimony of Kopin and Bernstein lacking, that is not the standard. Under the

deferential standard of review, the question for this court is whether *no reasonable person* would take the view adopted by the trial court, and defendant's claims fall far short of that standard. The trial court's decision here easily rested within the broad bounds of its discretion.

¶ 160        The supreme court has written that a physician needs merely to be "*familiar* with the methods, procedures, and treatments ordinarily observed by other physicians, in either the defendant physician's community or a similar community." (Emphasis added.) *Purtill v. Hess*, 111 Ill. 2d 229, 243, 489 N.E.2d 867 (1986). We conclude that the trial court did not abuse its discretion when it concluded that Kopin and Bernstein had the familiarity and competency to opine as to the standard of care in emergency departments.

¶ 161            C. Allen's Counsel's Alleged Misconduct Did Not Deprive

Defendant of a Fair Trial

¶ 162        Last, defendant claims that it was deprived of a fair trial because Allen's counsel (1) circulated a pretrial press release that biased the jury; (2) employed a strategy of asking improper questions to unfairly undermine the credibility of defendant's experts; (3) made improper comments about the integrity of defendant, defendant's counsel, and defendant's witnesses; and (4) used improper closing argument to psychologically pressure the jury. Defendant essentially claims that Allen's counsel's misconduct was so pervasive and prejudicial that defendant is entitled to a new trial. For the reasons that follow, we disagree.

¶ 163                        1. *The Alleged Misconduct*

¶ 164        Defendant argues that Allen's counsel engaged in misconduct in the following instances.

¶ 165                        a. The Press Release

¶ 166        Shortly before trial, Allen's counsel created a press release about the trial and

- 42 -

posted it on counsel's Facebook page, where it was shared more than 100 times. None of the jurors who acknowledged having seen the press release were impaneled.

¶ 167           b. Allen's Counsel's Allegedly Improper Questions and Argument

¶ 168                   i. *Allen's Counsel's Cross-Examination of Yalavarthi*

¶ 169           At the beginning of Allen's cross-examination of Yalavarthi, Allen's counsel asked, "An expert witness who is evasive should not be believed, right?" Defendant objected, and the trial court sustained that objection. Defendant asked for no further relief.

¶ 170           Allen's counsel asked Yalavarthi, "So, of the 36 or so cases you reviewed a year, you only were able to give me about five plaintiff's lawyers, right?" Defendant objected, but the trial court directed Yalavarthi to answer the question, and Yalavarthi replied, "Yes." Allen's counsel followed up by asking, "Now, without the names of other plaintiff's lawyers, it's hard for us to get depositions. You're aware of that, right?" Defendant objected, and the trial court sustained the objection. Defendant asked for no further relief.

¶ 171           Later, Allen's counsel asked Yalavarthi, "Did you ever bother to look at the MRI that was done on September 28th? Your disclosures don't list it." Yalavarthi replied, "Yes." Allen's counsel asked, "You did?" Yalavarthi again replied, "Yes." Allen's counsel then asked, "Your disclosures didn't list you did." At this point, defendant objected, and the trial court sustained the objection. Defendant asked for no further relief.

¶ 172           The trial court admonished the parties that no one was to inform the jury the reason that Dale was unavailable to testify. Despite that admonition, Allen's counsel asked Yalavarthi, "And you're aware that Dr. Dale is ill and can't testify, right?" Defendant objected, and the trial court sustained that objection. Allen's counsel continued, "Are you aware that Dr. Dale can't testify?" Defendant again objected, and the court sustained the objection. Allen's counsel then

said, "Pretty convenient to blame a guy who can't testify, isn't it?" Defendant objected, and the trial court sustained the objection and ordered Allen's counsel to "[m]ove on to another topic, please."

¶ 173    After the trial court directed Allen's counsel to move on, defendant asked for no further relief at that time. However, the next day defendant raised the matter with the court and said, "I'm not here to raise some sanction motion against [Allen's counsel], and I take him at his word that it was inadvertent." The court asked, "What relief do you wish?" Defendant replied by asking "the [c]ourt to tell the jury today there was [a] comment yesterday as to the reason why [the testimony of] Dr. Dale was presented by trial transcript, not in person, and you are not to concern yourselves with the reason for that, and then I would suggest the [c]ourt read the jury the appropriate IPI instruction about evidence deposition testimony." The court agreed to provide that relief, and defendant requested nothing further.

¶ 174              ii. *Allen's Counsel's Cross-Examination of Talan*

¶ 175    At the beginning of Allen's counsel's cross-examination of Talan, counsel asked questions regarding Talan's testimony in prior cases. Allen's counsel and Talan engaged in the following question and answer:

"Q. And you've testified in ten to 20 epidural abscess cases, right?

A. Actually, I didn't know the exact number, but that may be correct.

Q. Well, isn't that what you told me in your deposition?

A. I—I probably said—we can read it, but I probably—I don't remember the exact number. I probably gave you an estimate.

[ALLEN'S COUNSEL]: May I approach, Your Honor?

THE COURT: Line and page, please. For counsel.

- 44 -

[ALLEN'S COUNSEL]: I'll just—okay. Seventeen.

Q. I asked you, How many times have you testified in a spinal epidural abscess case total? You said, I don't know. I asked you, Do you have any idea? You said, Probably more than ten and less than 20, and I asked you Can you be more specific? You said, No. Do you recall that?

[DEFENSE COUNSEL]: Judge, I would move to strike that. He did not offer testimony in trial that's different from that."

¶ 176 The trial court sustained defendant's objection and directed Allen's counsel to move on. Defendant asked for no further relief.

¶ 177 A short time later in that cross-examination, Allen's counsel asked, "And at the time of your deposition, Doctor, you didn't even recall and tell me that you had testified in a spinal epidural abscess case last year, 2018, in federal court in Oregon?" Defendant objected, but the trial court overruled the objection. Talan answered, "I didn't recall it, no." Allen's counsel and Talan then engaged in the following question and answer:

"[ALLEN'S COUNSEL]: You couldn't recall—federal court is kind of a big deal, isn't it?

THE COURT: Sustained.

Q. You didn't recall—you didn't tell me that you had testified in federal court in 2018, and that's because you didn't want me to find that deposition and trial testimony, isn't that right, Doctor?

[DEFENSE COUNSEL]: Asked and answered. Form, argumentative.

THE COURT: Overruled.

Q. Isn't that right?

- 45 -

A. Yeah. Excuse me, no, I couldn't remember it.

Q. And you testified in a case involving the U.S. government in 2018 in an abscess case, didn't you? You don't recall that now?

[DEFENSE COUNSEL]: Asked and answered.

A. Epidural abscess case? I don't recall that, I'm sorry.

Q. Would you like to see your testimony?

A. I may have.

THE COURT: He said he didn't remember.

THE WITNESS: I don't remember.

[ALLEN'S COUNSEL]: I would like to refresh his recollection.

THE COURT: He's already indicated he doesn't remember.

Q. Do you deny testifying in federal court in 2018 on an abscess?

[DEFENSE COUNSEL]: Objection, relevance. Is he going to impeach, I mean—

A. If you have some record that I did it, I'm sure I did, but I don't recall those past cases."

¶ 178    Defense counsel then asked to approach the bench and argued to the trial court that this was an improper impeachment. The court heard arguments from both parties, and then said, "he doesn't recall. [The jury] can draw whatever conclusions from the fact that you deposed him in '18, that he didn't remember it. Leave it at that right now." Defendant asked for no further relief.

¶ 179    During closing arguments, Allen's counsel discussed his cross-examination of Talan by saying the following:

"Dr. Talan—I haven't seen anything like what went on in this courtroom in

- 46 -

a long time yesterday. And you know why it happened? Because he was trying to hide the statement that he's made over and over again when he's testified for plaintiffs—injured people—in these lawsuits. That's what spawned that. He knew that we had read his depositions from other cases. He knew that we know what he had taught to residents, students, and other doctors. And that's the statement that he had said many, many times. And that's what spawned yesterday."

Defendant objected, and the trial court sustained the objection. Defendant asked for no further relief.

¶ 180    c. The Allegedly Improper Comments About Defendant's Integrity

¶ 181    Defendant also argues that Allen's counsel made "repeated comments impugning the integrity of defendant, its counsel, and its witnesses."

¶ 182    During closing arguments, Allen's counsel said, "Now you will hear from the defense soon. And I expect you will hear a lot of re-writing history." Defendant did not object.

¶ 183    Allen's counsel in closing argument also said the following:

"Did anyone, to your knowledge, outside of the lawyers ever tell you that Dr. Dale misread the CT scan? Answer, no. The lawyers cooked that up. And the lawyers cooked up following him around with the vans and the cameras. Dr. Stout said he'd do this again. He would order a CT scan again for a patient like [Allen]. This needs to stop."

Defendant then objected, and the trial court sustained the objection. Defendant asked for no further relief.

¶ 184    Allen's counsel also argued the following: "Don't follow people with disabilities around with briefcases and film them with their kids. Don't send vans out to lurk around and film

them, crippled people with their kids. You need to put a stop to this." Defendant objected, and the following ensued:

> "THE COURT: Sustained.
>
> [ALLEN'S COUNSEL]: Defend the care.
>
> THE COURT: Move on, please.
>
> [ALLEN'S COUNSEL]: Defend the care. But they can't defend the care, so instead they follow him around."

¶ 185      Defendant did not repeat its objection at this point and asked for no further relief.

¶ 186      d. Allen's Counsel's Allegedly Pressuring the Jury in Closing Argument

¶ 187      During closing argument, Allen's counsel argued the following:

> "That verdict tells this community what you thought of the evidence in this case. Your verdict is going to be recorded. And it's going to go down in the basement of this building forever. It's going to be recorded. And everywhere in this building that verdict will be recorded as a judgment. And it will speak what you folks thought of the evidence in this case. So what you do today will be recorded as what you thought of the evidence and what you decided with regard to your verdict in this case. And it's important what you're going to decide in this case, because Sarah Bush needs to treat patients like people."

¶ 188      Defendant objected and moved to strike. The trial court sustained the objection and granted the motion. Defendant asked for no further relief.

¶ 189      Allen's counsel also argued the following:

> "Ladies and gentlemen, I can promise you this, that from time to time, the rest of your lives—and I don't know when it will be. It may be at a dinner function,

maybe when you're watching a TV show. It may be when you're dealing with a health problem of your own. But I promise you from time to time the rest of your life, you will think of your experience in this courtroom. Guarantee it. When you're with your loved ones, you will look up and think, wow, I remember my experience in court. And you will ask yourself, I wonder where Mark Allen is. Did I do him justice?"

¶ 190 Defendant again objected and moved to strike, and the trial court again sustained the objection and granted the motion. However, Allen's counsel continued, "This experience you have will remain with you the rest of your life at times. We'll all go on, but you will think of it." Defendant did not object again.

¶ 191 2. *The Law*

¶ 192 "Generally, the prompt sustaining of an objection by a trial judge is sufficient to cure any error in a question or answer before the jury." (Internal quotation marks omitted.) *People v. Mims*, 403 Ill. App. 3d 884, 897, 934 N.E.2d 666, 678 (2010). "Moreover, the jury is presumed to follow the instructions given to it by the trial court." *Id.*

¶ 193 3. *This Case*

¶ 194 This case turns on defendant's failure to timely request at trial the relief defendant now seeks on appeal—a new trial. The late Justice Antonin Scalia, in the context of federal proceedings, explained the following principle: "No procedural principle is more familiar to this Court than that a . . . right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." (Internal quotation marks omitted.) *Puckett v. United States*, 556 U.S. 129, 134 (2009). Justice Scalia continued as follows:

"This limitation \*\*\* serves to induce the timely raising of claims and objections, which gives the [trial] court the opportunity to consider and resolve them. That court is ordinarily in the best position to determine the relevant facts and adjudicate the dispute. In the case of an actual or invited procedural error, the [trial] court can often correct or avoid the mistake so that it cannot possibly affect the ultimate outcome. And of course the contemporaneous-objection rule prevents a litigant from ' "sandbagging" ' the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor." *Id.*

¶ 195     And we add to Justice Scalia's wise counsel that a party aggrieved by alleged improprieties at the trial level must first seek timely relief from the trial court to address whatever prejudice the aggrieved party claims to have suffered before seeking on appeal the harsh relief of reversal and remand for a new trial.

¶ 196     In this case, Allen's counsel's advocacy went outside the bounds of proper argument on numerous occasions. Defendant responded by employing several of the many tools available to correct such improprieties. Defendant utilized a combination of objections, motions to strike, and requests for the trial court to instruct the jury to disregard the offending evidence and arguments. As demonstrated by our recitation of the events, the trial court was not shy about providing defendant those remedies and would often sustain the objection and further instruct the jury when requested.

¶ 197     Now, however, defendant wants more, something it did not ask for at any time before the jury returned its verdict. Defendant claims that the remedies requested and provided at trial were not enough and that this court should reverse and remand for a new trial. We disagree.

¶ 198     First, defendant complains about some evidence and argument that defendant did

- 50 -

not object to at trial. We will not consider this complaint because it is clearly forfeited.

¶ 199 Second, defendant complains of evidence and argument for which defendant did object or ask for relief, such as a jury instruction, and the trial court granted the relief requested. The record shows that the trial court granted defendant all of the relief defendant requested.

¶ 200 This court has addressed claims regarding improper closing arguments in medical malpractice cases. The first was *Holder v. Caselton*, 275 Ill. App. 3d 950, 657 N.E.2d 680 (1995), in which the plaintiff appealed a jury verdict for the defendant physicians on the ground that the defendants presented irrelevant and prejudicial testimony and argument. The plaintiff argued the defendants presented improper evidence (1) that they were physicians in the community, (2) about the length of time one of the physicians had served the community, and (3) of how one of the physicians was recruited to work in the community. *Id.* at 956. This court explained that one of the problems with the plaintiff's argument "is that she did not make a timely objection to the great majority of the allegedly improper testimony and argument." *Id.*

¶ 201 The second case, interestingly, involves the same defendant as the present case, *Lovell v. Sarah Bush Lincoln Health Center*, 397 Ill. App. 3d 890, 931 N.E.2d 246 (2010). In that case, a jury returned a verdict in favor of the patient and against the defendant, Sarah Bush Lincoln Health Center (Health Center), for over two million dollars based upon medical malpractice during the plaintiff's surgery. The Health Center appealed, arguing that the trial court erred by denying the Health Center's motion for mistrial based on inappropriate statements by plaintiff's counsel's during opening statement and closing argument. *Id.* at 891-92.

¶ 202 The record in *Lovell* showed that within the 27 pages of the record that comprised the plaintiff's counsel's opening statement, the Health Center did not object to any of the 11 statements it brought to the attention of this court as a basis for reversal. The Health Center argued

that it was not required to make a contemporaneous objection to each of plaintiff's counsel's argumentative and prejudicial comments to preserve the issue on appeal, but this court disagreed. *Id.* at 897. We explained why as follows:

> "[T]he Health Center may have made a tactical judgment not to object to the 11 comments it now claims constitute substantial prejudicial error that warrants a new trial. *** [T]he Health Center's failure to object—whether intentional or unintentional—deprived the trial court of the opportunity to rule on any allegedly objectionable argument and, by extension, fails to preserve any such claims on appeal." *Id.* at 898.

¶ 203 The third case is *Arkebauer*, in which this court rejected the plaintiff's argument that the defendants' closing argument was improper. *Arkebauer*, 2021 IL App (4th) 190697, ¶ 1. We concluded that, "even assuming the challenged portion of defendants' closing argument was improper, plaintiff was not denied a fair trial, and there was no reversible error." *Id.* ¶ 91. In support of this conclusion, we quoted a case in which the First District wrote the following:

> "A new trial is not warranted based on an improper opening statement or closing argument unless, when the trial is viewed in its entirety, the argument resulted in substantial prejudice to the losing party or rose to the level of preventing a fair trial. [Citations.] [E]rrors in opening statements or closing argument *must* result in *substantial* prejudice *such that the result would have been different absent the complained-of remark* before reversal is required." (Emphases in original and internal quotation marks omitted.) *Davis v. City of Chicago*, 2014 IL App (1st) 122427, ¶ 84, 8 N.E.3d 120.

¶ 204 Here, the trial court in its written order noted that "defense counsel did not object

to many of the statements it now takes exception to, and \*\*\* when it did object[,] the [c]ourt generally sustained its objection, and, multiple times ordered the statements stricken and to be disregarded."

¶ 205    We note that in *Lovell*, this court wrote the following: "In this case, we agree with the trial court's finding that [plaintiff's] comment in closing argument \*\*\* was inappropriate. However, despite the Health Center's characterization of that comment, the record before us falls short of a matter that 'infected the fundamental fairness of the trial.' " *Id.* at 899 (quoting *People v. Bishop*, 218 Ill. 2d 232, 251, 843 N.E.2d 365, 376 (2006)). The same conclusion applies to this case.

¶ 206    Defendant now asks for a new trial, but defendant did not ask the trial court for a mistrial before the jury returned its verdict. Justice Scalia warned of "sandbagging," a situation in which a party would remain silent about a particular relief and only raise the error later if the case did not conclude in the party's favor. The present case is reflective of Justice Scalia's concerns. Defendant did not ask for a mistrial during trial but lost and now asks for that relief on appeal. We are not persuaded defendant should be granted any further relief.

¶ 207                    4. *Allen's Counsel's Conduct*

¶ 208    Despite our conclusion that reversal is not appropriate, we do not wish to be seen as condoning the conduct of Allen's counsel in this case. One example of particularly troubling conduct occurred during Allen's cross-examination of Yalavarthi. Despite the trial court's having admonished the parties that no one was to inform the jury of the reason why Dale was unavailable to testify, Allen's counsel asked Yalavarthi, "And you're aware that Dr. Dale is ill and can't testify, right?" Defendant objected, and the trial court sustained that objection. Allen's counsel continued, "Are you aware that Dr. Dale can't testify?" Again, defendant objected, and the trial court

sustained the objection. Allen's counsel then said, "Pretty convenient to blame a guy who can't testify, isn't it?" Defendant objected, and the trial court sustained the objection and ordered Allen's counsel to "[m]ove on to another topic, please." The exchange shows how Allen's counsel repeatedly ignored the court's rulings to expose the jury to prejudicial information previously excluded by the court or not supported by the evidence.

¶ 209       Another example of Allen's counsel's disregard of the trial court's rulings occurred during closing argument when counsel said, "Don't follow people with disabilities around with briefcases and film them with their kids. Don't send vans out to lurk around and film them, crippled people with their kids. You need to put a stop to this." No evidence was ever presented during the trial to support these assertions. Defendant objected and the following ensued:

"THE COURT: Sustained.

[ALLEN'S COUNSEL]: Defend the care.

THE COURT: Move on, please.

[ALLEN'S COUNSEL]: Defend the care. But they can't defend the care, so instead they follow him around."

¶ 210       This court recognizes that in the heat of trial, counsel may inadvertently ask improper questions. However, this misconduct was not inadvertent. Allen's counsel on at least these two occasions flagrantly disobeyed the trial court's orders.

¶ 211       When the trial court sustains an opposing party's objection, that is not a judicial action to be complied with only if the offending counsel agrees with the ruling. The examining attorney has three choices: (1) rephrase the question in a manner that corrects the problem, (2) make an offer of proof outside the presence of the jury, or (3) move on.

¶ 212       The trial court has a role to play in these situations as well. Normally, a trial court

exercises restraint in taking action *sua sponte* and rightly so. However, in a situation where a party continues with a line of questioning or argument after an objection has been sustained, a trial court can and likely should intervene, particularly, as here, when counsel's disregard of the court's ruling is so flagrant and repetitious. After all, it is the *trial court's* authority and control of the proceedings that the offending counsel has chosen to disregard.

¶ 213　　　　　In appropriate circumstances, the trial court would be fully justified to take action to reduce any advantage that the offending attorney could gain as a result of his abusive behavior. For instance, the judge could calmly interrupt and *sua sponte* inform the jury as follows:

> "Attorney Smith has just ignored the court's ruling in which I sustained the [other party's] objection. When I sustain an objection, that means that the [question or comment] is improper, and you should not consider it when you retire to deliberate. To avoid the possibility of Attorney Smith's gaining an unfair advantage by disobeying my ruling, I trust that when you begin to deliberate, you will disregard Attorney Smith's conduct."

¶ 214　　　　　　　　　　　　　III. CONCLUSION

¶ 215　　　　　For the reasons stated, we affirm the trial court's judgment.

¶ 216　　　　　Affirmed.

| | |
|---|---|
| **Cite as:** | *Allen v. Sarah Bush Lincoln Health Center*, 2021 IL App (4th) 200360 |
| **Decision Under Review:** | Appeal from the Circuit Court of Coles County, No. 13-L-45; the Hon. Mark E. Bovard, Judge, presiding. |
| **Attorneys for Appellant:** | Joshua G. Vincent and Kimberly A. Jansen, of Hinshaw & Culbertson LLP, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Stephen D. Phillips, Terrence M. Quinn, Stephen J. Phillips, and Michael R. Bertucci, of Phillips Law Offices, of Chicago, for appellee. |