2023 IL App (2d) 230004-U
No. 2-23-0004
Order filed November 7, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THOMAS MARGULES, | ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 18-CF-691 |
| MICHAEL SCHEER, M.D.,Individually and as an Agent of Advocate Condell Medical Center; DANIEL A. LIESEN, M.D., Individually and as an Agent of Advocate Condell Medical Center; AMIT PARIKH, D.O.,Individually and as an Agent of Advocate Condell Medical Center; and ADVOCATE CONDELL MEDICAL CENTER, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants | ) ) | |
| (Michael Scheer, M.D., and Amit P. Parikh, D.O., Defendants-Appellees). | ) ) ) | Honorable David P. Brodsky Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court.
Presiding Justice McLaren and Justice Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in making the challenged evidentiary rulings, and the trial court properly awarded costs to defendants. Accordingly, we affirm.

¶ 2    Plaintiff, Thomas Margules, appeals from the trial court's denial of his motion for a new trial and its grant of costs to defendants Michael Scheer, M.D., and Amit Parikh, D.O. Plaintiff moved for a new trial after the jury found in favor of defendants on plaintiff's claim of medical negligence. Plaintiff claimed that defendants were negligent in delaying his surgery to evacuate a scrotal hematoma that he developed as a result of an inguinal hernia surgery.

¶ 3    On appeal, plaintiff argues that the trial court abused its discretion in several ways: (1) allowing defendants to introduce evidence of plaintiff threatening and harming his parents, (2) permitting a defense expert to reference photographs of other scrotal hematomas during his testimony, and (3) permitting the same witness to opine on the condition of plaintiff's penis. We affirm.

¶ 4                    I. BACKGROUND

¶ 5    At the outset, we briefly comment on plaintiff's statement of facts and his submitted report of proceedings. Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020) requires that an appellant's brief provide a statement of facts that contains the facts necessary for an understanding of the case. Here, plaintiff's statement of facts is lacking in the detail and specificity necessary for a full understanding of the relevant proceedings, which included motions *in limine*, jury selection, a multi-day jury trial, and a post-trial motion. We note that plaintiff's statement of facts is largely copied and pasted from the background section of his October 17, 2022, motion for a new trial. What may be appropriate in a motion before the trial court is not necessarily appropriate for an appellate brief. This court had to rely heavily on defendants' brief for a sufficient overview of the relevant proceedings. We admonish plaintiff to provide a complete recitation of the relevant facts in future appeals.

¶ 6　　In addition, Illinois Supreme Court Rule 323 (eff. July 1, 2017) requires a report of proceedings that is certified by the court reporting personnel who transcribed the report of proceedings. Here, the transcript of the trial proceedings is not included in the report of proceedings but instead is included in the common law record as exhibits attached to plaintiff's motion for a new trial. These exhibits are almost all in the format of four pages of transcripts per page of the record, often with poor visual fidelity, hindering our review. Plaintiff is admonished to prepare a report of proceedings in future appeals that contains all the relevant transcripts of proceedings.

¶ 7　　　　　　　　　　　　　　　　A. Complaint

¶ 8　　On August 31, 2018, plaintiff filed his four-count complaint against Scheer, Parikh, Daniel A. Liesen, M.D., and Advocate Condell Medical Center.[1] Plaintiff's complaint arose from his September 1, 2016, inguinal hernia surgery performed by Scheer. Plaintiff alleged that, as a result of the surgery, he developed a "massive inguinal scrotal hematoma," which required an additional operation on September 2, 2016, to evacuate the hematoma. He alleged that the hematoma caused his scrotum to become "extremely enlarged," causing him severe pain and nerve damage, and, as of the date of the complaint, he continued to experience extreme pain, swelling, and discomfort.

¶ 9　　Relevant to this appeal are count I (negligence directed against Scheer) and count II (negligence directed against Parikh). In count I, plaintiff alleged that Scheer was negligent in performing the September 1, 2016, hernia surgery on plaintiff, and that Scheer's negligent surgery

--------------------------------

[1]Prior to trial, plaintiff voluntarily dismissed Liesen and Advocate Condell Medical Center without prejudice (on February 11, 2021, and January 25, 2022, respectively). Unless otherwise noted, references to "defendants" in this disposition are to defendants Scheer and Parikh only.

directly and proximately caused his injuries. In count II, plaintiff alleged that Parikh was negligent in removing the hematoma that developed as a result of the initial hernia surgery, including by delaying the surgery until irreversible damage had occurred, and Parikh's negligence directly and proximately caused him injuries. In defendants' answer, they denied all allegations of negligence.

¶ 10                                B. Motions *in Limine*

¶ 11    Plaintiff filed a motion *in limine* on July 11, 2022, in which he requested that the court prohibit defendants from broaching numerous matters at trial. Relevant to this appeal, plaintiff requested that the defense be barred from referencing or introducing evidence of the restraining order proceedings between plaintiff and his parents. Plaintiff's motion *in limine* did not address any specific altercation between him and his parents, nor did it address any threatening text messages sent by plaintiff.

¶ 12    On July 15, 2022, the trial court granted plaintiff's motion to bar evidence of restraining order proceedings in a "limited fashion," barring evidence of only the judicial process of plaintiff's parents obtaining an order of protection against him.

¶ 13    Defendants filed a motion *in limine* on July 21, 2022, seeking to bar plaintiff from using four photographs he produced on July 17, 2022, depicting the then-current condition of his genitals (the current-condition photographs), and to bar expert opinions based on those photographs. The motion alleged that the current-condition photographs produced via email were taken on or around July 16, 2022, and that, based on the photographs, plaintiff's retained experts were making previously undisclosed opinions that plaintiff was permanently disfigured as a result of defendants' negligence. Defendants argued that the photographs should be barred because they were disclosed on the eve of trial and plaintiff had the opportunity to disclose photographs of such nature earlier.

¶ 14    The trial court denied defendants' motion *in limine* to bar use of the current-condition photographs.

¶ 15                              C. Jury Selection

¶ 16    The trial began with jury selection on July 26, 2022. In addressing the first group of 20 prospective jurors, plaintiff's counsel asked whether anyone had any issues or experiences with posttraumatic stress disorder (PTSD). Prospective juror 318 answered that she had experienced PTSD symptoms because she was at the Highland Park mass shooting on July 4, 2022, at an Independence Day parade.

¶ 17    Plaintiff's counsel then asked whether juror 318's experience would cause her "pause" in hearing this case. She answered, "I would hope not." Plaintiff's counsel asked juror 318 whether she could be fair and impartial in light of plaintiff's allegation that defendants' negligence caused his PTSD, and she answered, "Yes."

¶ 18    After plaintiff's counsel had finished questioning the group, defense counsel asked juror 318 whether she suffered from PTSD, and she answered that there was "just a lot of stress and things happening, so even being in the courtroom and seeing the officer's gun in the elevator—I was reacting. So I don't know if I would clinically say it, but we're all processing." Defense counsel continued, stating that, in this case, plaintiff was claiming that he suffered from PTSD as a result of his injuries, and he asked juror 318 whether she thought she "would be favoring the plaintiff because of his PTSD claims and what [she] went through." She answered, "Possibly. I think I would be fair but possibly I might be biased." She went on to clarify, however, that her experience did not make her think that plaintiff had a legitimate claim before she had even heard the evidence, and she believed she could give defendants a fair trial.

¶ 19    After the questioning of the first group of prospective jurors was complete, the trial court asked the parties for challenges for cause on the prospective jurors. Neither party challenged juror 318 for cause. The trial court then gave the parties an opportunity to exercise a peremptory challenge on juror 318, and neither party did. At the time of the parties' opportunity to exclude juror 318, plaintiff had used only three of his five peremptory challenges. Juror 318 was empaneled on the jury, and she became the foreperson.

¶ 20                                    D. Trial Proceedings

¶ 21    On July 27, 2022, the parties made their opening statements. In plaintiff's opening statement, counsel told the jury that it would hear evidence regarding the standard of care and whether defendants breached the standard of care.

¶ 22    As to plaintiff's theory of the case, he was "not saying that the physicians, the defendants in this case, did the surgeries wrong," referring to plaintiff's surgeries on September 1 and 2, 2016. Instead, plaintiff's theory was "that there was a delay after the September 1 surgery before the September 2[] surgery of over 24 hours, and that delay caused damage." Plaintiff argued that it was the delay in making the decision to evacuate the hematoma that caused his injuries.

¶ 23    Plaintiff's counsel also stated that the jury would hear from Dr. Chepuru, a psychiatrist, who would testify that plaintiff had PTSD "because there was a triggering event." The triggering event was the pain and changes to plaintiff's body caused by his surgeries.

¶ 24    Plaintiff's counsel further told the jury that plaintiff's injuries included nerve damage, erectile dysfunction, and psychiatric problems. Counsel continued that plaintiff "was not a perfect person. He has a history. *** He's had family issues, big family problems." Counsel argued that, even taking plaintiff's history into account, the evidence would show that plaintiff's surgeries

exacerbated his preexisting conditions and caused a new injury in the form of PTSD. Plaintiff was seeking $5 million in damages.

¶ 25    Plaintiff's first witness was Scheer, who performed plaintiff's right inguinal hernia surgery on September 1, 2016. Plaintiff's counsel showed Scheer photographs of plaintiff's incision area that plaintiff had sent him via email around 6:30 p.m. on September 1, 2016. Scheer agreed that the pictures showed swelling and were concerning. Scheer disagreed that the swelling was abnormal, testifying that "[t]his does happen after surgery." Scheer directed plaintiff to go to the emergency department, where Scheer examined him around 10 or 11 p.m. that same night. Scheer recommended keeping plaintiff NPO (nothing by mouth) in case surgery would be needed the next day.

¶ 26    Scheer testified that, as of the next morning, plaintiff's hemoglobin level was down relative to his admission the night before, and that indicated he had "a little bleeding going on." In deciding on plaintiff's second surgery, Scheer considered plaintiff's bleeding and the fact that he was in pain. He testified that, in plaintiff's case, evacuating the hematoma would likely improve his pain, but the size of his hematoma and the risk of nerve damage were not factors weighing in favor of surgery. Scheer did not believe that plaintiff's hematoma required emergency surgery.

¶ 27    Scheer typically took a conservative approach to scrotal hematomas, refraining from treatment. In a hypothetical case, the size of the hematoma would not affect his decision to surgically intervene, although Scheer conceded shortly thereafter that the size would be "a little part of" the decision to surgically intervene. Scheer described plaintiff's hematoma as "[m]oderately large." Scheer disagreed that plaintiff's hematoma could cause injury to the adjoining nerve systems. It was his opinion that plaintiff experienced no nerve damage as a result

of his hematoma. Scheer testified that plaintiff had scrotal pain before he performed any surgeries on plaintiff.

¶ 28 Scheer testified that he was scheduled to leave for a vacation on September 2, 2016, and no operating room was available before 3 p.m. Therefore, Scheer called his partner, Parikh, who agreed to perform plaintiff's surgery to evacuate the hematoma.

¶ 29 On cross-examination, defense counsel asked Scheer whether, based on the four current-condition photographs, plaintiff's genitals showed any differences or disfigurement relative to before Scheer operated on plaintiff. Plaintiff's counsel objected based on the opinion being undisclosed.

¶ 30 The trial court overruled the objection. The court explained that it had previously ruled that it would allow plaintiff to use the current-condition photographs and that plaintiff's use would not surprise or prejudice defendants. The court reasoned that since plaintiff had supplied the photographs, defendants' use of the photographs was not an improper surprise, and that plaintiff was going to have his experts testify regarding the same photographs. Scheer answered the question, testifying there was no difference in plaintiff's scrotum's appearance in the current-condition photographs relative to its pre-surgery appearance.

¶ 31 On redirect examination, plaintiff's counsel asked Scheer several questions about the current-condition photographs.

¶ 32 Following Scheer's testimony, Parikh testified that, based on his examination of plaintiff, he agreed with Scheer that plaintiff's hematoma was not an emergency. Parikh arrived at the hospital around 10 p.m. on September 2, 2016, and he believed that he met with plaintiff before performing the evacuation surgery to remove blood from the scrotal area.

¶ 33    Dr. David Mayer was plaintiff's retained expert in surgery,[2] and he provided testimony via a video evidence deposition that was taken on July 18, 2022. Mayer offered his opinion on Scheer and Parikh's "postsurgical course." Mayer testified that, in the evening after plaintiff's hernia surgery, his hernia site began to swell and bleed. Mayer referenced plaintiff's picture from the around 6:30 p.m. on September 1, 2016, which Mayer testified as showing "a big, swollen, inguinal, bleeding wound *** full of blood."

¶ 34    Mayer opined that "[w]hen you do an operation and the same day the area blows up and fills with blood, that's a surgical emergency." He opined that such a patient should go "right to the operating room." His criticism of Scheer was that he saw plaintiff in the emergency department the night of September 1, 2016, but he did not immediately send plaintiff to the operating room.

¶ 35    In response to questioning by plaintiff's counsel about the permanency of plaintiff's condition, Mayer testified that the "photographs taken six years later submitted by the patient show the same degree of scrotal swelling, although it's no longer black and blue," as the swelling depicted in the September 3, 2016, postoperative picture of plaintiff's scrotum. Mayer further opined that, had plaintiff been drained promptly on the evening of his first surgery, "most, if not all, of this massive scrotal swelling and the permanent—permanent nature of it could have been avoided. The delay proximately caused the massive, permanent scrotal swelling."

¶ 36    Before plaintiff's counsel called the next witness, the following proceedings occurred outside the presence of the jury. Plaintiff's counsel asked the trial court to limit testimony as to the

_____

[2]Mayer was also a lawyer, having gone to Hofstra Law School in 2007 after having practiced medicine as a board-certified surgeon since 1978. He graduated with a JD in 2010, passed the bar exam, and practiced law in New York from 2011 to 2014.

circumstances that led plaintiff's parents to obtain an order of protection against him. Although plaintiff's counsel was not seeking to bar evidence that "there was a fight, that there was an altercation" between plaintiff and his parents, counsel did not want "to get into the sordid details of, you know, the broken ribs or threw him down on the floor or whatever it is, because that's going to be an obvious criminal act to the jury."

¶ 37    Defense counsel responded that plaintiff had placed his behavioral issues and mental illness at issue and that the challenged evidence was relevant to rebutting plaintiff's claim that the outcome of his surgeries is what caused his mental illness.

¶ 38    Plaintiff's counsel replied that he was "not suggesting that they can't ask about family dynamics, they can't ask if there was a fight, they can't ask if it was physical. I'm not barring any of that." Plaintiff's counsel reiterated his stance later in the sidebar, conceding that the defense could bring out the fact that plaintiff and his parents had a fight, and that it resulted in injury and family discord. What plaintiff's counsel wanted was for the trial court to limit the evidence that would result in showing a criminal act to the jury, including physical injuries to the parents and a text message threatening to murder his family. Counsel described the text as a "kind of angry text," and explained that the text "precipitated the need for an order of protection by his family." Later, plaintiff's counsel put it more bluntly: "The text says he's going to murder his family."

¶ 39    Following the parties' arguments, the trial court ruled that, aside from evidence that the police were involved or that a legal process resulted, the parties could introduce evidence of individual altercations between plaintiff and his parents. The trial court recognized that the evidence was "not pretty" and understood why it was prejudicial, but it was also relevant. The court reasoned that the jury was entitled to "this truth as well" and believed the jury would be able

to put the evidence into the appropriate context, similar to how it believed the jury would put the plaintiff's graphic photographs into the appropriate context.

¶ 40    The trial court further ruled that the parties could introduce evidence of the threatening text message. The trial court stated that the text "sounds like an angry outburst," and it noted that one of plaintiff's expert witnesses was going to testify that these angry outbursts were more likely than not caused by plaintiff's worsening depression and PTSD caused by the delay in the evacuation of his hematoma. Defendants had "a right to explore that," and the text message was an angry outburst that predated the surgeries at issue.[3]

¶ 41    Plaintiff's next witness was his father, Dr. Kenneth Margules. At the time of his testimony, Kenneth was a practicing rheumatologist. Plaintiff, who was 40 years old at the time of Kenneth's testimony, was the oldest of his three children. Kenneth had recommended Scheer to plaintiff to treat his hernia.

¶ 42    Kenneth testified that, prior to plaintiff's September 2016 surgeries, he was generally a happy person. Prior to the surgeries, the only mental illness that Kenneth was aware his son had was attention-deficit/hyperactivity disorder (ADHD), which was diagnosed when plaintiff was five years old.

¶ 43    Kenneth continued that, following plaintiff's September 2016 surgeries, plaintiff changed. "It was kind of an off-the-table type of abrupt change." Plaintiff was often angry and confrontational; he was a "totally different person." Kenneth testified that one time plaintiff "got

---

[3]Plaintiff's counsel did not have the actual text message, and when they asked defense counsel whether he intended to "put the text up," defense counsel responded, "If you didn't provide it, how would I have it?"

so angry he gave me a bear hug and actually broke a rib." Another time, plaintiff pushed Edith, who was plaintiff's mother and Kenneth's wife, and she injured her shoulder. Plaintiff was angry that his parents had "directed his care" the way that they had.

¶ 44    Kenneth testified that, at one point following his surgeries, plaintiff "texted his cousin that he wanted to kill us both and was going to do it but didn't know how to do it." Kenneth saw the text because the cousin texted him, but Kenneth "did not take it as anything but an empty threat." Thereafter, Kenneth and Edith separated from plaintiff for a few years. Plaintiff eventually got treatment, and he was no longer angry or having outbursts. Kenneth testified that their relationship had been restored.

¶ 45    Kenneth was with plaintiff at the emergency department on the evening of September 1, 2016. Kenneth examined plaintiff, and plaintiff's scrotum "was about the size of a grapefruit."

¶ 46    When Kenneth began to testify about the condition of plaintiff's scrotum and penis after the surgeries, defense counsel objected to Kenneth testifying to plaintiff's current condition, as such testimony was not previously disclosed. The trial court overruled the objection, stating that although the testimony was not previously disclosed, it did not believe the defense was surprised by it. The court explained: "We've all seen pictures about what—recent pictures. We've heard descriptions. This is something that he observed. *** I'm going to allow it." Kenneth then testified to the condition of plaintiff's penis, in that it had "shrank and retracted up" and had not changed since the time of his surgeries.

¶ 47    On cross-examination, defense counsel asked Kenneth whether he was aware that, from 2006 to present, plaintiff had been regularly receiving psychiatric treatment for his mental illnesses. Kenneth answered that he was "vaguely aware" that plaintiff had ongoing psychiatric care, but plaintiff had hired an attorney previously to enjoin him from asking about his psychiatric

providers. Counsel also asked about plaintiff's behavior prior to the surgery, and Kenneth had recognized a "mild shift" in plaintiff's behavior during and after attending college.

¶ 48    Defense counsel also asked Kenneth whether he "threw [plaintiff] out of the house" after "the events described earlier," including plaintiff breaking Kenneth's rib, assaulting Edith, and texting a relative that he intended to kill his parents. Kenneth answered, "That's correct."

¶ 49    Plaintiff's counsel next examined plaintiff's mother, Edith Margules. She testified that, following plaintiff's September 2016 surgeries, he became "very depressed" when he realized he was not healing. Prior to the surgeries, he had "[s]ome depression," but "that's a part of ADHD." Plaintiff started having outbursts of anger after his surgeries, in part because he was in pain. As a result of plaintiff's angry outbursts, she was "affected physically" and was concerned for her and her husband's safety. As a result, she separated from plaintiff for four years.

¶ 50    On cross-examination, defense counsel asked Edith if she was aware that plaintiff had been regularly seeing Dr. Cann, a psychiatrist, since around 2006. Edith answered yes. Edith also confirmed that plaintiff had sent a text message to a family member in which he threatened to kill her and her husband.

¶ 51    Plaintiff next called Dr. Stephen Cann, his psychiatrist. Cann testified that he had been treating plaintiff since 2007. At the time of his testimony, Cann had three current diagnoses for plaintiff: PTSD, ADHD, and bipolar disorder. He had diagnosed plaintiff with bipolar disorder "shortly after I started seeing him," and plaintiff's ADHD diagnosis dated back to childhood.

¶ 52    Cann diagnosed plaintiff with PTSD following his September 2016 surgeries. His PTSD diagnosis was based on plaintiff having "traumatic flashbacks and traumatic nightmares because he needed to avoid stimuli that reminded him of the traumatic event" of his surgeries. Plaintiff was triggered by "his alarm at seeing a gross change in his body." Plaintiff did not feel like his concerns

were being taken seriously, and he did not know what to do about it. Plaintiff had taken various psychotropic medications over the course of Cann's treatment.

¶ 53    Plaintiff's counsel questioned Cann about a letter he wrote, dated September 11, 2021, where Cann noted that plaintiff had "homicidal ideas with a plan, but without intent," asking him to explain what that meant. Cann replied that it meant that plaintiff had thought about killing people but never intended to carry out the thought. Plaintiff's counsel followed-up, asking, "for example, if he sent a text to his cousin and said 'I'm going to murder my parents,' would that be an example of homicidal ideas with a plan but without intent?" Cann answered yes.

¶ 54    On cross-examination, Cann testified that, prior to September 2016, plaintiff had exhibited anger and aggressive behavior. According to Cann's notes, plaintiff had been experiencing anger issues as early as August 2007. Cann also had a note from June 16, 2008, that Kenneth had noticed aggressiveness from plaintiff, and a note from September 8, 2008, that Kenneth reported plaintiff becoming increasingly rude, brusque, and aggressive. Cann and Kenneth had been classmates in medical school.

¶ 55    Defense counsel also asked Cann about Dr. Sahebi, who Cann identified as a psychologist that plaintiff had seen for psychotherapy. Defense counsel read Sahebi's note from May 2, 2018, wherein she wrote that "it was discovered in this session that [plaintiff's] PTSD symptoms are related to the loss of his family after the surgery rather than the complications with the surgery itself." When asked whether he had a reason to disagree with Sahebi's opinion, Cann answered that "this is an opinion about events rather than a difference in the facts of the events." On redirect examination, Cann testified that doctors can disagree, but Sahebi's opinion "would cause [him] to think about" his own opinion. He agreed with Sahebi that plaintiff's family problems "preexisted and were serious," but ultimately Sahebi's opinion did not change his opinions.

¶ 56    Dr. Yadagiri Chepuru testified via a video evidence deposition taken on July 18, 2022. He was a psychiatrist, and he had interviewed plaintiff via Zoom. The interview was arranged and scheduled by one of plaintiff's attorneys. Based on his evaluation of plaintiff, he did not believe that plaintiff suffered from PTSD prior to his September 2016 surgeries. He opined that plaintiff's PTSD was the result of postsurgical complications, including a hematoma, that plaintiff experienced after his September 1, 2016, hernia surgery. Chepuru further opined that plaintiff's angry outbursts, as described by his parents, were more likely than not caused by plaintiff's PTSD and worsening depression.

¶ 57    Plaintiff's final expert witness, Dr. Alexander E. Weingarten, who was board-certified in anesthesiology and pain management, testified via video evidence deposition taken on July 20, 2022. He believed that plaintiff would have had pain after his hematoma evacuation, "at least during the early part of that hospitalization." He opined that the pain plaintiff was claiming was likely chronic and permanent and was the result of the delay in his hematoma evacuation.

¶ 58    Plaintiff's final witness was himself. Plaintiff testified that, prior to his September 2016 surgeries, he had an "excellent relationship" with his father and an "ever-improving relationship" with his mother. Prior to those surgeries, he had been diagnosed with ADHD, depression, and hypomania, which was a version of bipolar disorder. He took medication for these diagnoses and attended psychotherapy.

¶ 59    Plaintiff testified that when he left the hospital after his September 1, 2016, hernia surgery, he was "doing all right, had a little bit of bleeding but it was taken care of." The surgery was at 10 a.m., and he left the hospital before 2 p.m. and got some ice cream on the way home. At home, as the anesthesia wore off, plaintiff began to feel significant swelling in his lower abdomen. Around 6:30 p.m., he became concerned about his condition, and he took pictures and emailed them to

Scheer. When Kenneth returned home about an hour later, he observed plaintiff's condition and decided to take him to the emergency department. At the emergency department, plaintiff was in great pain, which he described as "erupting." He believed that he received fentanyl and morphine for the pain, but the medication did not eliminate the pain; it merely made him not care about the pain.

¶ 60 Plaintiff had not met Parikh before he performed the hematoma evacuation at approximately 11 p.m. on September 2, 2016. He denied that Parikh spoke to or examined him before the operation.

¶ 61 Plaintiff testified that, after his surgeries, his "penis did not come to show itself for quite some time thereafter," and his scrotum was larger than it used to be. Plaintiff had trouble urinating because he was "so disfigured [he] couldn't urinate." He later clarified that he could urinate, but it "sort of just sprays, makes a mess. So I try to urinate in the shower." Prior to September 1, 2016, his penis "looked like a normal typical penis and worked like one." After the surgeries, he was no longer able to have sex or get an erection.

¶ 62 Plaintiff's counsel showed plaintiff the four current-condition photographs. Plaintiff identified them as the photographs taken about a week and a half before his testimony, and he testified that they were a true and accurate depiction of his genitalia as of his testimony that day. Observing one of the photographs, plaintiff described his penis as retracted, which was the condition the penis had been in since his surgeries.

¶ 63 Plaintiff testified that he still had pain in his scrotum, testicles, and all the way back to his anus. The pain was "like an explosion. Sometimes it's like fire." He had not experienced that level of pain prior to his hematoma.

¶ 64    Plaintiff's counsel asked plaintiff whether, as a result of his anger issues following his surgeries, he ever lashed out at his family. Plaintiff answered that he had, but he did not recall whether he ever had a physical altercation with his father. He did not recall giving his father a bear hug that cracked three of his father's ribs, nor did he remember hitting his mother. However, he could not deny that these events happened. As a result of altercations with his parents, he and his parents did not speak for years. He currently "[got] along great" with his family.

¶ 65    Dr. Gregory T. Bales was defendants' expert in urology. Prior to Bales' testimony, plaintiff's counsel made a relevance-based objection to photographs of Bales' patients referenced in Bales' deposition. The photographs were of Bales' patients who he had treated for a hematoma in the scrotal area. Defense counsel responded that plaintiff was arguing that he had a "massive" scrotal hematoma, and the relevance of the photographs was to show what an extraordinarily large scrotal hematoma looks like.

¶ 66    The trial court found that the photographs were relevant and that Bales could speak to his experience treating scrotal hematomas, but it stated that Bales "shouldn't be talking about the photographs and the outcome *** of any particular photograph. Those are just by way of demonstratively showing the size in comparison to what we've seen with the plaintiff." Thus, the court ruled that the photographs could be used demonstratively only on the issue of relative size. Defense counsel agreed that Bales would not offer testimony about the treatment or outcomes of the specific patients in the photographs.

¶ 67    Bales testified that hematomas were a known complication of an inguinal hernia surgery. He had seen hundreds of inguinal scrotal hematomas over his career, explaining that he probably saw one a month over the course of 25 years. Bales opined that plaintiff's hematoma did not cause plaintiff's erectile dysfunction or cause nerve damage.

¶ 68    Defense counsel showed Bales three photographs depicting examples of scrotal hematomas, and plaintiff's counsel objected based on relevance. The trial court overruled the objection. The photographs depicted anonymous patients treated at the University of Chicago, and Bales had provided the photographs to defense counsel. Looking at the first photograph, Bales testified that "this is just representative of what can happen with the scrotum when it fills with blood, sort of how elastic it can be." Bales agreed with defense counsel that the photographs helped explain his testimony about how a scrotum can expand when there is bleeding within.

¶ 69    Defense counsel asked Bales if he ever ordered an evacuation for any of the patients he treated with scrotal hematomas. Bales answered that, in his practice, he could not recall having had to perform such an evacuation. Bales explained that "each case is a little bit different and it's always reasonable to have that discussion with any individual patient because *** it's perfectly reasonable at times to evacuate hematomas." Although the decision to operate had to be made on a case-by-case basis, Bales' "general rule of thumb" was to allow hematomas to "heal spontaneously without the need for further surgical procedure." Bales opined that, although it was reasonable for Scheer to recommend the hematoma evacuation, plaintiff's hematoma was not an emergency, and he disagreed with the conclusion that this was a massive hematoma requiring immediate intervention. Referencing the three photographs from earlier, Bales explained his opinion that "we just visualized that the handful of the hematomas that I've dealt with at the University of Chicago and take on another 300, it's never been my experience in the 30 years I was a urologist that there [were] any ramifications of these hematomas in terms of nerve damage or nerve injuries."

¶ 70    Defense counsel displayed the current-condition photographs of plaintiff, and Bales confirmed that he had reviewed them. Over plaintiff's objection, Bales testified that, based on the

current-condition photographs, he did not see anything in the photographs that indicated disfigurement of the genitals. When asked if it was his opinion that the penile retraction was the result of obesity, Bales answered that "penises all come in different shapes and sizes *** but that looks like a very characteristic appearance in a gentleman *** who's a bit overweight and kind of a little stockier. That's just a typical appearance, yes." Bales summed up his observation on redirect examination as "[plaintiff's] penile and scrotal pictures look pretty normal to me."

¶ 71    The final witness was Dr. David Mahon, who was defendants' expert witness in general surgery. He testified that he had been practicing general surgery for 30 years and had probably performed an inguinal hernia surgery every week for the past 30 years. He had reviewed the operative reports of Scheer and Parikh for plaintiff's surgeries. He opined that it was reasonable for Parikh to wait until an operating room was available in the evening of September 2, 2016, to perform plaintiff's hematoma evacuation. He also opined that it was reasonable for Scheer to not place plaintiff in an emergency surgery for his hematoma.

¶ 72    Mahon also reviewed the notes of Dr. Andrews, who was plaintiff's surgeon after he left Scheer and Parikh. Mahon testified that he read Andrew's notes from November 21, 2016, which was when Andrews first evaluated plaintiff. Andrews wrote that plaintiff did not have any scrotal swelling or penile changes.

¶ 73    On recross-examination, plaintiff's counsel showed Mahon the current-condition photographs of plaintiff's genital area. Plaintiff displayed one of the photographs and asked Mahon, "Is that a normal penis?" Mahon answered, "I think so." When asked if he could see the penis, he said no, explaining that the penis was retracted. Plaintiff's counsel showed Mahon another photograph, and Mahon agreed that he could not say whether plaintiff had a normal or

abnormal penis based on the photographs alone; he would have needed to examine him to make such a determination.

¶ 74    In defendant's closing argument, counsel told the jury that it had "heard a whole lot of talk about damages. *** [B]ut if the plaintiff doesn't prove that Dr. Scheer and Dr. Parikh were medically or professionally negligent, you don't even have to consider the issue of damages. *** First you evaluate lability *** because if there's no liability, you don't even talk about injuries. It doesn't matter." Counsel then explicitly told the jury members that if they decided for defendants on the question of liability, that neither were negligent, they should enter verdict form B, which "simply state[d], We the jury find in favor of the defendants and against the plaintiff."

¶ 75                    E. Jury Verdict and Motion for New Trial

¶ 76    On August 3, 2022, the jury returned a general verdict in favor of defendants and against plaintiff. The trial court entered a judgment order that same day.

¶ 77    On October 17, 2022, plaintiff moved for a new trial. Therein, he argued that he was entitled to a new trial because the trial court committed several errors in the admission of evidence and because the verdict was against the manifest weight of the evidence. Regarding the erroneous admission of evidence, plaintiff argued that the trial court erred in allowing Bales to testify using photographs of his patients and to testify as to his opinion regarding the condition of plaintiff's penis. Plaintiff further argued that the trial court erred in allowing evidence of the specifics of plaintiff's altercations with his parents and plaintiff's threat to kill his parents. Plaintiff contended that the erroneous admission of these two sets of evidence was more prejudicial in light of the Highland Park shooting because the shooter had a superficially similar background to plaintiff, which the jury "may have inadvertently projected onto the Plaintiff." The motion continued that, "[i]ndeed, it appears to be no coincidence that the one person who was at the event where the

Highland Park Shooting took place became the foreperson." In his motion, plaintiff attached a New York Times article from July 5, 2022, on the shooting, entitled "The suspect and his family had long ties to Highland Park and a troubled past."[4]

¶ 78    On December 15, 2022, following a hearing on the matter, the trial court denied plaintiff's motion for a new trial. At the hearing, the trial court commented that the only way the Highland Park shooting intersected with plaintiff's trial, aside from the fact that juror 318 was in the vicinity of the shooting, was that the arraignment of the defendant in that case occurred during plaintiff's trial in the same courthouse. The trial court stated that the shooting "in no way affected the jury. It in no way creeped into our trial. It had nothing to do with our trial."

¶ 79    Although, the trial court recognized that there was enhanced security at the courthouse on the date of the arraignment, it did not believe that the enhanced security inconvenienced the jurors, and it noted that security was present at the courthouse in some capacity every day. The trial court saw no evidence that the jury was affected by the presence of the press or the closure of one road, and it "certainly" did not see "any evidence that in any way our jurors were affected by some newspaper article that the defendant in an unrelated case had a bad relationship with his parents."

¶ 80    Plaintiff timely appealed.

¶ 81                                    II. ANALYSIS

¶ 82    Plaintiff raises two primary issues on appeal. He argues that the trial court erred in denying his motion for a new trial, and he argues that defendants were not entitled to costs.

¶ 83                                 A. Motion for New Trial

---

[4]Plaintiff references the same article in his appellate brief.

¶ 84    We review the trial court's denial of a motion for a new trial for an abuse of discretion. *Burmac Metal Finishing Co. v. West Bend Mutual Insurance Co.*, 356 Ill. App. 3d 471, 481 (2005). In determining whether the trial court abused its discretion, the reviewing court should consider whether the jury verdict was against the manifest weight of the evidence and whether the losing party received a fair trial. *Maple v. Gustafson*, 151 Ill. 2d 445, 455 (1992).

¶ 85    With respect to plaintiff's motion for a new trial, he argues that the court erred in denying the motion because the cumulative effect of several errors prejudiced him. Specifically, plaintiff argues that the court erred (1) in admitting evidence of certain altercations between plaintiff and his parents and a reference to a text message where plaintiff stated he wanted to kill his parents, (2) in allowing Bales to reference photographs of other patients, and (3) in permitting Bales to opine regarding the condition of plaintiff's penis based on the current-condition photographs.

¶ 86    Thus, plaintiff is not arguing that the verdict was against the manifest weight of the evidence. Instead, he is arguing that he received an unfair trial based on errors in evidentiary rulings, which we review for an abuse of discretion. *Timothy Whelan Law Associates, Ltd. v. Kruppe*, 409 Ill. App. 3d 359, 365 (2011); see also *Hoffman v. Northeast Illinois Regional Commuter Railroad Corporations*, 2017 IL App (1st) 170537, ¶ 49 (the abuse-of-discretion standard applies to a trial court's balance of the evidence's probative value against its prejudicial effect, pursuant to Illinois Rule of Evidence 403 (eff. Jan. 1, 2011)). An abuse of discretion occurs when no reasonable person could agree with the trial court. *Kruppe*, 409 Ill. App. 3d at 366.

¶ 87                              1. Evidence Related to Plaintiff's Parents

¶ 88    Plaintiff argues that there was no probative value in allowing the jury to hear the specifics of his altercations with his parents and the physical injuries that he caused his parents. Such specifics included that he punched them, pushed them, and threw things at them. He contends that

defendants could have argued that his actions were related to his PTSD without reference to the specific details of the altercations.

¶ 89    Plaintiff also contends that there was no probative value in allowing the jury to hear the contents of his text message in which he expressed his desire to kill his parents. Plaintiff argues that evidence of both the text message and his altercations with his parents were highly prejudicial.

¶ 90    Plaintiff continues that his argument is "especially true in light of the Highland Park shooting that had occurred the same month that the trial started." He argues that the Highland Park shooter "had a similar background to the Plaintiff (at least superficially), which the Jury may have inadvertently projected onto the Plaintiff." Plaintiff highlights that, similar to plaintiff's background, the Highland Park shooter came from a dysfunctional family, had a history of mental illness, and threatened to kill everyone. He also argues that juror 318 was at the Highland Park shooting, characterizing her presence on the jury as a "prejudice amplifier."

¶ 91    Plaintiff, in an attempt to rebut a counterargument, contends without citation to any authority that he was not required to use a peremptory strike on juror 318 or to move to strike her for cause. He argues that removing juror 318 would not have cured the fact that the entire jury pool was exposed to the events of the Highland Park shooting and attendant media coverage.

¶ 92    In sum, plaintiff argues that the introduction of the text message and evidence of altercations between him and his parents deprived him of a fair trial because the only purpose of the evidence was to shift the jury's focus away from the alleged negligence and onto his character.

¶ 93    Defendants respond that plaintiff cannot complain of error in evidence he introduced at trial and, even if he could, the evidence was relevant to establish the cause of plaintiff's alleged PTSD. Defendants argue that plaintiff introduced the evidence of the text message during

questioning of plaintiff's father, and he introduced evidence of physical altercations between him and his parents during his own testimony.

¶ 94    Addressing plaintiff's argument that the jury compared him to the Highland Park shooter, defendants argue that plaintiff provided no evidence that the jury's deliberations were actually impacted by the Highland Park shooting or the shooter's arraignment. As to juror 318, defendants argue that plaintiff waived any argument based on the juror's participation in deliberations because he failed to challenge the juror for cause or use a peremptory challenge on her. Furthermore, at *voir dire*, the juror indicated that she "possibly" could be more favorable *to plaintiff* based on his claim of PTSD and the juror's experience during the Highland Park shooting.

¶ 95    We agree with defendants that plaintiff cannot now complain of the evidence he introduced. Here, plaintiff elicited details of his altercations with his parents during his case-in-chief. In response to plaintiff's counsel's questioning, Kenneth testified that plaintiff was a different person after his surgeries, getting "so angry he gave [Kenneth] a bear hug and actually broke a rib." Edith confirmed that she was also "affected physically" by plaintiff.

¶ 96    Plaintiff himself gave testimony related to specific altercations with his parents. Plaintiff's counsel asked him if he ever lashed out at his family, and specifically whether he gave Kenneth a bear hug that cracked his ribs and whether he hit Edith so hard that he almost broke her nose and injured her shoulder. Plaintiff's answer was that he did not recall doing those things, but he did not deny them. Plaintiff acknowledged that as a result of the altercations with his parents, he did not speak with his parents for several years.

¶ 97    Plaintiff also elicited testimony of the threatening text message. During plaintiff's examination of Kenneth, Kenneth testified that, following plaintiff's surgeries, plaintiff sent a text to his cousin that said he wanted to kill his parents but did not know how to do it. Kenneth testified

that he dismissed the text as an "empty threat," although following the threat, he and his wife separated from plaintiff for several years. Plaintiff's counsel also asked Cann about whether sending a text message to plaintiff's cousin threatening to kill his parents would be an example of a homicidal idea plaintiff had.

¶ 98     A party cannot complain about the evidence they introduce. *Romanek-Golub & Co. v. Anvan Hotel Corp.*, 168 Ill. App. 3d 1031, 1040 (1988); see also *Guzeldere v. Wallin*, 229 Ill. App. 3d 1, 12 (1992) ("Once plaintiff introduced that evidence, he could not later complain of defendant's evidence in response."). Although plaintiff initially objected to the evidence of the text message and specific altercations between him and his parents, he cannot both introduce the evidence and preserve his objection. See *Fleming v. Moswin*, 2012 IL App (1st) 103475-B, ¶ 99 (explaining that the plaintiffs forfeited argument over the admission of certain evidence where the plaintiffs had introduced the evidence to which they had objected). Accordingly, we hold that plaintiff has forfeited this argument.

¶ 99     We further reject plaintiff's arguments that he was denied a fair trial because the jury was prejudiced against him. First, as to his argument that juror 318 was a "prejudice amplifier," plaintiff clearly forfeited argument that she should have been excluded from the jury. *People v. Metcalfe*, 202 Ill. 2d 544, 551-52 (2002) (explaining that an objection to a juror is waived when a party fails to challenge the juror for cause or use one of their peremptory challenges to excuse the juror); *cf. Hall v. Cipolla*, 2018 IL App (4th) 170664, ¶ 171 (a ruling on a challenge for cause is reviewable only when the objectionable juror was empaneled after a party had exhausted all peremptory challenges). Here, plaintiff did not object to juror 318 for cause, nor did he use one of his two remaining peremptory challenges when asked by the court whether he wished to exercise a peremptory challenge on juror 318.

¶ 100   Moreover, plaintiff's argument that the jury denied him a fair trial is the epitome of speculative argument. See *People v. Bush*, 2022 IL App (3d) 190283, ¶ 113 ("Defendant's mere speculation on appeal is not sufficient to establish a claim of juror bias."). The only non-speculative evidence of bias in the record is from juror 318, against whom plaintiff has forfeited any objection. At *voir dire*, juror 318's answered that she might be biased *in favor* of plaintiff because of his claim of PTSD, before ultimately saying she could be fair.

¶ 101   The remainder of plaintiff's argument rests on the unfounded assumption that the jury independently made a prejudicial connection between the Highland Park shooter, who was accused of carrying out an act of mass violence using a firearm to kill 7 members of the general public and injure 48 more, and plaintiff, who had physical altercations with his parents before later reconciling. Plaintiff fails to direct us to any evidence supporting the notion that the jury based its verdict on plaintiff's character, much less on making a connection between plaintiff's character and the Highland Park shooter's. The mere fact that the Highland Park shooter was arraigned during plaintiff's trial at the same courthouse as his trial was immaterial to whether the jury was unfairly biased against plaintiff in his civil medical negligence trial based on plaintiff's character. The jury heard no comparisons between plaintiff and the Highland Park shooter, and, as we have already determined, it was plaintiff who introduced the evidence that he now argues prejudiced the jury against him.

¶ 102   In essence, plaintiff is asking us to assume that jury members read about the Highland Park shooter of their own volition and, based on a handful of general commonalities between plaintiff and the shooter, they necessarily disregarded the evidence in reaching their verdict. The record contains no evidence that the jury actually knew about the Highland Park shooter's personal history. Even if they had known, plaintiff's background and behavior, including a history of mental

illness and his text saying he intended to kill his parents, which he did not act on and which his own father testified was an empty threat, do not support a reasonable comparison to the Highland Park shooter, who was charged with actually murdering and attempting to murder numerous members of his community.

¶ 103   For all these reasons, the trial court did not abuse its discretion in permitting the introduction of evidence of plaintiff's threatening text message and altercations with his parents.

¶ 104                    2. Demonstrative Evidence of Other Hematomas

¶ 105   Plaintiff argues that the trial court also erred in allowing Bales to testify using photographs of other patients' scrotal hematomas. He argues that the relevance of the photographs could not be established, because it was impossible to know the mechanisms or procedures that caused the depicted hematomas and whether the hematomas were even treated. He also argues that the photographs were highly prejudicial in that they minimized his injuries, "making it seem as though they were commonplace." Finally, he argues that the anonymous photographs deprived him of the ability to meaningfully cross-examine Bales about the depicted patients.

¶ 106   Defendants respond that the trial court did not abuse its discretion in allowing Bales to use three photographs of anonymous patients to assist the jury in understanding what a "massive" hematoma looked like. Defendants emphasize that the three photographs were shown merely for demonstrative purposes. Defendants contend that the photographs were relevant to rebut testimony that plaintiff's scrotum following his first surgery necessitated emergency surgery for the hematoma. As to plaintiff's argument that he was unable to cross-examine Bales about the cause of the other patients' hematomas and their injuries, defendants argue that the photographs were used to explain only Bales' opinion that the *size* of plaintiff's hematoma did not require surgical evacuation. We agree with defendants that the trial court did not abuse its discretion.

¶ 107    Demonstrative evidence has no probative value in itself but instead serves as a visual aid to the jury in comprehending the verbal testimony of a witness. *Cisarik v. Palos Community Hospital*, 144 Ill. 2d 339, 341 (1991); see also *Sharbono v. Hilborn*, 2014 IL App (3d) 120597, ¶ 30 (the great value of demonstrative evidence lies in the human factor of understanding better when something is seen). The primary considerations in allowing demonstrative evidence are relevancy and fairness, and the decision to allow demonstrative evidence is within the trial court's discretion. *Bachman v. General Motors Corp.*, 332 Ill. App. 3d 760, 796 (2002). As to relevancy, the demonstrative evidence must actually illustrate or explain the verbal testimony of the witness. *Sharbono*, 2014 IL App (3d) 120597, ¶ 30. As to fairness, the demonstrative evidence may be excluded when the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *Id.* (quoting Illinois Rule of Evidence 403 (eff. Jan. 1, 2011)). Demonstrative photographs should not be admitted if they are inaccurate or would mislead or confuse the jury. *Johnson v. Bailey*, 2012 IL App (3d) 110016, ¶ 13.

¶ 108    Here, the demonstrative photographs were relevant to explain Bales' opinion that plaintiff's hematoma did not require an emergency surgical evacuation. Beginning with the complaint, plaintiff put the size of his scrotal hematoma at issue, alleging a "massive" hematoma that caused his injuries. Plaintiff's expert witness, Mayer, testified that, when the surgical site "blows up with blood, that's a surgical emergency," and that the permanent nature of plaintiff's injuries could have been avoided had defendants drained the scrotum promptly. Kenneth testified that plaintiff's scrotum at the emergency department was the "size of a grapefruit." Plaintiff also showed the jury photographs of his own scrotum in his case-in-chief.

¶ 109    To rebut plaintiff's claims, the defense offered Bales' testimony about the need for an emergency hematoma evacuation. In his testimony, Bales referenced several photographs of

anonymous patients, which he testified were representative of "how elastic" a scrotum can be and helped explain how a scrotum expands in response to bleeding. In short, the pictures provided visual context to Bales' testimony, which included his "rule of thumb" to allow hematomas of the sizes depicted to "heal spontaneously without the need for further surgical intervention."

¶ 110   In addition to the photographs being relevant, they were not unfairly prejudicial, confusing, or misleading. Although plaintiff takes issue with the pictures making his hematoma look "commonplace," Bales was an expert witness precisely because he had experience treating hundreds of scrotal hematomas. In fact, when asked by defense counsel if he had seen "300 to 400 different scrotal hematomas" in patients he had treated over the past 25 years, Bales answered, "[T]hat's probably a reasonable number, 250, 300, 400. *They're common*." (Emphasis added.) It was entirely appropriate, if not necessary, for Bales to testify that he had seen many scrotal hematomas before offering his expert opinion on plaintiff's hematoma. Furthermore, whether a condition is relatively common does not in and of itself minimize the seriousness of the condition. To wit, had Bales opined that scrotal hematomas required emergency evacuation, the common occurrence of scrotal hematomas in his practice would have bolstered that opinion as well.

¶ 111   Far from being prejudicial or misleading, the demonstrative photographs helped Bales convey his knowledge and experience to the jury. Importantly, the photographs demonstrated scrotal hematomas generally and did not purport to show what plaintiff experienced specifically. Compare *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 492-93 (2002) (affirming the admission of a video depicting the formation of a bacterial infection because it helped the doctor-defendant explain the development of endocarditis, a condition for which the plaintiff was at risk), and *Glassman v. St. Joseph Hospital*, 259 Ill. App. 3d 730, 754-56 (1994) (finding no abuse of discretion in the admission of video evidence of a heart surgery performed by different surgeons

on different patients where the video was relevant to the defense theory and was an instructional film showing how the procedure was performed), with *Spyrka v. County of Cook*, 366 Ill. App. 3d 156, 168 (2006) (holding that a video animation depicting the formation of a pulmonary embolism was not a general demonstrative exhibit because the video purported to show, in a step-by-step progression, what happened to the particular plaintiff-patient).

¶ 112   Lastly, it was unnecessary for plaintiff to cross-examine Bales on the causes and outcomes of the individual patients' hematomas from the anonymous photographs. Again, the photographs were demonstrative of Bales' general experience with scrotal hematomas, including the size of such hematomas. Bales never testified to the cause or outcome of a hematoma in a specific patient, much less the anonymous patients depicted; he testified only that he had seen many such scrotal hematomas, that he did not recall ever evacuating one, and that he had never observed a scrotal hematoma causing the injuries plaintiff claimed. Plaintiff's counsel was free to cross-examine Bales about his testimony and the photographs shown, and he did so, including asking questions about the specific areas depicted in the demonstrative photographs and the comparative level of bruising shown in plaintiff's photographs.

¶ 113   In sum, the photographs were relevant to explain Bales' testimony, and photographs did not require exclusion for any reason under Illinois Rule of Evidence 403 (eff. Jan. 1, 2011). Accordingly, the trial court did not abuse its discretion in allowing Bales to reference the photographs during his testimony.

¶ 114             3. Expert Opinion Based on the Current-Condition Photographs

¶ 115   Plaintiff's final evidentiary argument is that the trial court erred in permitting Bales to opine on the condition of plaintiff's penis based on the current-condition photographs. Plaintiff argues that Bales' testimony amounted to an improper surprise in contradiction of the purpose of

Illinois Supreme Court Rule 213(f). Plaintiff also contends that, even if the jury never reached the issue of damages because it found defendants did not breach the standard of care, Bales' testimony was an attack on plaintiff's credibility and was therefore "extremely prejudicial."

¶ 116   We reject plaintiff's arguments. We simply see no way that plaintiff was surprised by Bales' testimony about the current-condition photographs. Here, plaintiff was the party that disclosed the current-condition photographs, and the trial court permitted plaintiff to use the current-condition photographs. Moreover, plaintiff squarely put the condition of his genitals at issue. Kenneth testified to the current condition of plaintiff's penis over defendants' objection, and Mayer testified that "photographs taken six years later submitted by [plaintiff] show the same degree of scrotal swelling," in apparent reference to the current-condition photographs. Plaintiff himself identified the current-condition photographs and testified that, prior to his surgeries, his penis looked normal, but following his surgeries, his scrotum was larger, and his penis became retracted and "so disfigured" that it affected his ability to urinate. Under these circumstances, plaintiff cannot reasonably claim surprise that the defense's urologist would offer his opinion on the physical state of plaintiff's genitals based on plaintiff's current-condition photographs. *Cf. A-Tech Computer Services, Inc. v. Soo Hoo*, 254 Ill. App. 3d 392, 403 (1993) (explaining that the defendants could not be surprised by evidence on the reopening of proofs to which they had previously stipulated).

¶ 117   Furthermore, Bales' testimony about the current-condition photographs was not unfairly prejudicial. Bales did not call plaintiff a liar or impugn the character of his experts. He merely offered his opinion as a urologist, that the current-condition photographs did not show disfigurement of the genitals and that plaintiff's penis and scrotum as depicted looked "pretty normal." This was proper and expected of a defense witness.

¶ 118   Accordingly, we hold that the trial court did not abuse its discretion in permitting Bales to opine based on the current-condition photographs. Finally, as we have rejected all three of plaintiff's contentions of evidentiary error, there can be no prejudice resulting from any cumulative effect of errors, and the trial court did not abuse its discretion in denying plaintiff's motion for a new trial.

¶ 119                                                4. Two-Issue Rule

¶ 120   As an alternative basis to affirm the denial of plaintiff's motion for a new trial, defendants argue that under the "two-issue" rule, the jury's general verdict created a presumption that the jury found in favor of defendants on every defense raised, including that defendants did not breach the standard of care. The "two-issue" rule provides that a general verdict without special interrogatories will be upheld where the case involved two or more theories, and the evidence was sufficient to support at least one of the theories. *Allen v. Sarah Bush Lincoln Health Center*, 2021 IL App (4th) 200360, ¶ 120 (quoting *Lazenby v. Mark's Construction, Inc.*, 236 Ill. 2d 83, 101 (2010)). In other words, "a general verdict creates a presumption that the jury found in favor of the victorious party on every claim, theory, or defense raised." *Perez v. St. Alexius Medical Center*, 2022 IL App (1st) 181887, ¶ 64. Defendants argue that plaintiff's arguments do not address the standard of care, only the issue of damages.

¶ 121   Although defendants' argument has intuitive appeal, we do not reach the merits of this argument because we have already determined that the trial court did not commit any evidentiary error and we affirm on that basis.

¶ 122                                                B. Costs

¶ 123   Plaintiff also argues that, because he is entitled to a new trial, we should reverse the trial court's award of costs to defendants as the prevailing parties under section 5-109 of the Code of

Civil Procedure (735 ILCS 5/5-109 (West 2018)). As we have rejected plaintiff's arguments for a new trial, we likewise reject his argument on costs.

¶ 124                                          III. CONCLUSION

¶ 125   For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 126   Affirmed.